

1996 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-31-1996

# Marzano v. Computer Science

Precedential or Non-Precedential:

Docket 95-5629

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1996

Recommended Citation

"Marzano v. Computer Science" (1996). *1996 Decisions.* Paper 145.
http://digitalcommons.law.villanova.edu/thirdcircuit_1996/145

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1996 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 95-5629
_____


CATHERINE A. MARZANO,

Appellant

v.

COMPUTER SCIENCE CORP. INC.;
CSC PARTNERS INC.

_____

On Appeal from the United States District Court
For the District of New Jersey

(D.C. Civil No. 94-3102)
_____


Argued May 23, 1996

Before: SLOVITER, Chief Judge,
SAROKIN and OAKES, Circuit Judges

_____


(Opinion filed July 31, 1996)

Mark Falk (Argued)
Madeline E. Cox
Carmen J. DiMaria
Barry & McMoran
One Newark Center
Newark, New Jersey 07102
Attorneys for Appellant

Theresa Donahoe Egler (Argued)
Rosalie J. Shoeman
Pitney, Hardin, Kipp & Szuch
P.O. Box 1945
Morristown, New Jersey 07962
Attorneys for Appellees

_____


OPINION OF THE COURT
_____

SAROKIN, Circuit Judge:

We are asked to consider once again the proper allocation of burdens in cases involving allegations of discriminatory employment actions. Cases of this nature inevitably raise thorny issues because they typically require the plaintiff to establish proof of the employer's intent not through direct evidence, which is rarely available, but through complex inferential schemes.

The issue in the specific matter before us concerns the elements of a prima facie case under the familiar McDonnell Douglas scheme in a case in which the plaintiff-employee was terminated, allegedly as the result of a reduction in the employer's workforce. The case raises as well issues involving the scope of the exceptions to the New Jersey Family & Medical Leave Act, the enforceability of communications by an employer as an implied contract, and the extent of liability of a parent corporation for its subsidiary's employment decisions.

## I. Facts and procedural posture

Even by the standards of the acrimonious world of litigation, there is little in this case about which the parties agree. They agree that appellant, Catherine Marzano, was hired by one of the appellees, Computer Science Corp., in September 1990; that she went on maternity leave in July 1993; that she gave birth to her son the next month; and that she was laid off on October 5, 1993. Beyond this bare-bones chronology, however, much is in dispute: who Ms. Marzano's employer was at any one time; how well that employer, whoever it was, was doing financially, and how we should determine this; what Ms. Marzano's job entailed; what the jobs of people hired after she was laid off entailed, and what qualifications were required to perform those respective jobs; why she was laid off; and who needs to establish the reason and what is necessary to do so.

Of one thing we are certain: on September 5, 1990, Ms. Marzano was hired by Computer Science Corporation ("CSC") as a "junior technical recruiter." Her contract indicates that she was hired as an at-will employee. She was assigned to work in a division of CSC named CSD in Piscataway, New Jersey.

At some later point, CSD was merged with CSC Partners, a wholly owned subsidiary of CSC. It is not entirely clear when the merger occurred. Defendants state that CSD and CSC Partners were "functionally merged" in April 1991, Appellees' Brief at 4; see App. at DAS 74; DAS 178-79, and that after the merger, all CSD employees became employees of CSC Partners.

According to testimony by officials of CSC Partners, at the time of the merger Partners was comprised of twelve separate business units. Defendants describe a business unit as "a revenue generation and profit and loss center for delivering consulting systems, integration and development work to its client base." App. at DAS 138. Most of the units are organized around a region. App. at DAS 183. There are, for instance, Chicago, Minneapolis, and NY Metro units. One unit, however, was

allegedly "devoted exclusively to servicing AT&T on a national basis." Appellees' Brief at 5; see App. at DAS 184-85. That unit was known as the AT&T National Business Unit.

According to Ms. Marzano's affidavit, the merger had little effect on her day-to-day worklife, to the point where she states that she "continued to consider herself a CSC employee." Appellant's Brief at 5. More significantly, she allegedly continued to collect paychecks from CSC for some time after the merger allegedly occurred. App. at A225.

Ms. Marzano's performance seems to have been satisfactory or better throughout her tenure at CSC and CSC Partners. After seven months of employment, she received a twenty-percent salary increase and a "good" performance review by her supervisor, App. at A227, and she received other positive feedback from the company. See, e.g., App. at A252.

In June 1991, Ms. Marzano was assigned to a new position. She contends that she was promoted to account executive for the Sales Division, App. at A227. Defendants, on the other hand, state that "her duties were modified to an administrative support role for the Bell Labs account" following a reduction of personnel at CSC Partners. App. at DA3. In any case, Ms. Marzano states that she received a "very good" evaluation at the end of that year. App. at A228.

In April 1992, she became marketing administrator for the AT&T National Account; she received a ten-percent salary increase and an "above-average" rating in her evaluation at the end of that year. App. at A228, A231.

Mr. Marzi stated in a deposition that he was hired as business unit manager of the AT&T Unit in September 1992. App. at DAS 134. After reviewing the Unit's marketing plan and finding it ineffective, he discontinued it and reassigned the marketing personnel. App. at DAS 142-47. As a result of the changes, Ms. Marzano's duties were allegedly reassigned to provide administrative support to Mr. Marzi. App. at DAS 147-49.

In January 1993, Ms. Marzano informed Mr. Marzi that she would be going on maternity leave in July. According to her affidavit, shortly before going on leave Mr. Marzi told her that she would receive additional responsibilities when she returned, and gave no indication that her position might be in jeopardy. App. at A231. She further asserts that when she left on maternity leave, she had a conversation with Mr. Marzi in which he spoke to her "as if [she] wasn't coming back." App. at A232. Ms. Marzano allegedly reassured Mr. Marzi that she intended to return immediately after maternity leave. Id.

According to Mr. Marzi's deposition, the AT&T Unit started experiencing "significant losses" beginning in the spring of 1993 as a result of AT&T's own financial difficulties, which led the telephone company to curtail its spending on consulting work. App. at DAS 136-37. As a result, the AT&T Unit allegedly started considering the need for staff reductions. According to Defendants, Ms. Marzano's position was particularly vulnerable because her salary was "non-billable" and non-revenue-generating, and her position "non-essential." Appellees' Brief at 9. Defendants allege that Mr. Marzi initially tried to "identify a

more essential role for plaintiff following her leave," id., but after financial conditions worsened, decided to eliminate her position altogether along with nine others out of some fifty positions in the AT&T Unit in New Jersey. Id. at 10. (According to Defendants, the AT&T Unit was eventually merged into the NY Metro Business Unit in March 1994. App. at DAS 139.)

In any case, Ms. Marzano went on maternity leave on July 27, 1993 and gave birth to her son on August 14, 1993. App. at A232. Mr. Marzi allegedly called her a few weeks later to tell her that her position was being "eliminated" and that she was fired. Id. On October 5, 1993, CSC Partners sent Ms. Marzano a letter of termination confirming the bad news and attributing the decision to a reduction in force in the AT&T Business Unit caused by financial difficulties. App. at DA47. Ms. Marzano asserts in her affidavit that she went to speak with Mr. Marzi shortly after her termination, and that he told her "how his wife had collected unemployment so [that] she could stay home with their kids and how [Ms. Marzano] might be 'better off' if [she] could stay home with [her] son and collect unemployment." App. at 233.

On November 1, 1993, Mr. Marzi circulated a memorandum to the "AT&T National Business Unit" and the "NY Metro Business Unit" announcing the consolidation of certain "services and functions" of the two units, and advertising three positions: administrative manager and marketing manager, both to be filled immediately, and "general consulting practice manager" for NY Metro. Ms. Marzano was, according to her affidavit, never advised of or considered for these positions. App. at A234–35. Barbara Zelasko, a person from outside CSC and CSC Partners, was hired as marketing manager in March 1994.

Ms. Marzano asserts in her affidavit that pregnancy was referred to as the "kiss of death" at CSC because numerous female employees (at least seven, she states) had been terminated after taking maternity leave. App. at A236.

Ms. Marzano instituted the instant action in response to her termination on May 18, 1994 by filing suit in the Superior Court of New Jersey against Computer Science Corporation and CSC Partners, Inc. ("Defendants"). In her complaint, Ms. Marzano alleged unlawful discrimination by Defendants on the basis of her pregnancy in violation of the New Jersey Law Against Discrimination, N.J.S.A. 10:5-12(a); unlawful interference with her rights under the New Jersey Family Leave Act, N.J.S.A. 34:11B-9; and breach of an implied-in-fact employment contract based on Defendants' written policy. The case was removed to the United States District Court for the District of New Jersey based on diversity of citizenship, 28 U.S.C. 1332.

Defendants responded to Ms. Marzano's complaint with a motion for summary judgment on all counts, pursuant to Fed. R. Civ. P. 56(c). The district court granted the motion on August 17, 1995, bringing the proceedings before that court to an end.

Ms. Marzano filed the instant appeal on August 28, 1995.

## II. Jurisdiction

This is a civil action between the citizens of different states, and the matter in controversy exceeds the sum of $50,000.

Therefore, the district court had original jurisdiction pursuant to 28 U.S.C.    1332(a)(1).

The district court issued an order granting Defendants' motion for summary judgment on August 17, 1995.  We have jurisdiction over an appeal from this final order pursuant to 28 U.S.C.    1291.

### III. Standard of review

We exercise plenary review over a grant of summary judgment by the district court, Armbruster v. Unisys Corp., 32 F.3d 768, 777 (3d Cir. 1994), and apply the same test that the district court should have applied.  Id.

Summary judgment should be granted if "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); seealso Armbruster, 32 F.3d at 777.  In making its determination, the court should view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor.  Armbruster, 32 F.3d at 777.

> In an employment discrimination case,
> the burden of persuasion on summary judgment remains
> unalterably with [the employer] as movant.  The
> employer must persuade the court that even if all of
> the inferences which could reasonably be drawn from the
> evidentiary materials of record were viewed in the
> light most favorable to [the plaintiff], no reasonable
> jury could find in [the plaintiff's] favor.

Sorba v. Pennsylvania Drilling Co., Inc., 821 F.2d 200, 201–02 (3d Cir. 1987), cert. denied, 484 U.S. 1019 (1988).

### IV. The employment discrimination claim

Ms. Marzano first claims that by terminating her employment, the defendants unlawfully discriminated against her on the basis of her pregnancy, in violation of the New Jersey Law Against Discrimination, N.J.S.A.    10:5–12(a).

The district court analyzed Ms. Marzano's allegation as a claim of discrimination in a force-reduction setting.  District Opinion, typescript at 4 (citing Massarsky v. General Motors Corp., 706 F.2d 111, 118 (3d Cir.), cert. denied, 464 U.S. 937 (1983)).  We have held that in order to establish a prima faciecase of this sort, "the plaintiff must show he was in the protected class, he was qualified, he was laid off and other unprotected workers were retained."  Armbruster v. Unisys Corp., 32 F.3d 768, 777 (3d Cir. 1994).  The district court, by its own admission, rejected the "literal language of the retention requirement," District Opinion at 5, and held instead that

> to establish a prima facie case in the context of a
> work-force reduction, a plaintiff must do more than
> merely show that unprotected employees were retained in
> their positions; the plaintiff must produce some
> additional evidence that he was singled out for
> discharge because of his protected status.

Id. at 5–6.

Based upon this novel standard, the district court found

that "plaintiff has merely asserted that while she was terminated, other employees were retained," id. at 6, and that she had "failed to adduce any evidence of a nexus between her pregnancy and her discharge" and "to demonstrate that other, nonpregnant workers were treated more favorably." Id. As a result, the court concluded that Ms. Marzano had failed to establish a prima facie case of discrimination, and that the defendants were entitled to summary judgment on this claim. Id.

Ms. Marzano challenges the district court's conclusion on a number of grounds. She argues, first of all, that no workforce reduction occurred, that accordingly the district court applied the wrong legal standard to her claim, and that under the proper legal standard she has established a prima facie case of discrimination. Appellant's Brief at 27. Second, Ms. Marzano argues that even if a workforce reduction did occur, the court did not apply the correct standard, id. at 30-34, and that, under the correct standard, Ms. Marzano has easily made a prima faciecase of discrimination. Id. at 29. Third, Ms. Marzano argues that even if the court did apply the right test, she did produce "additional evidence" of the defendants' discriminatory intent sufficient to meet her prima facie burden. Finally, Ms. Marzano argues that she has produced sufficient evidence to allow a jury to conclude that any reason proffered by the defendants for her layoff is pretextual. Id. at 38.

### A. The McDonnell Douglas burden-shifting scheme

The Supreme Court of New Jersey has adopted the methodology governing federal employment discrimination law for state claims of a similar nature. See Clowes v. Terminix International, Inc., 538 A.2d 794, 805 (N.J. 1988); Andersen v. Exxon Co., U.S.A., 446 A.2d 486, 490-91 (N.J. 1982).

The United States Supreme Court, in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), articulated the analytical framework for federal claims of employment discrimination in which the plaintiff seeks to make his or her case through circumstantial evidence. McDonnell Douglas set forth the basic allocation of burdens among employer and employee and order of presentation of proof:

> First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 252-53 (1981) (citations omitted).

While the burden of production may shift, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." Id. at 253.

In McDonnell Douglas, the Court explained that the plaintiff could meet his or her prima facie burden

> by showing (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

McDonnell Douglas, 411 U.S. at 802.

At the same time as it was articulating the elements of a prima facie case, the McDonnell Douglas Court explained in no uncertain terms that these elements might vary in "differing factual situations." Id. at 802 n.13. Similarly, we have often remarked that "'the nature of the required showing' to establish a prima facie case of disparate treatment by indirect evidence 'depends on the circumstances of the case.'" Torre v. Casio, Inc., 42 F.3d 825, 830 (3d Cir. 1994) (citing Massarsky v. General Motors Corp., 706 F.2d 111, 118 n.13 (3d Cir.), cert.denied, 464 U.S. 937 (1983)). In the context of a claim of discriminatory termination of employment, for instance, we have held that the plaintiff must "prov[e] by a preponderance of the evidence that (1) he belongs to a protected class; (2) he was qualified for the position; (3) he was dismissed despite being qualified; and (4) he ultimately was replaced by a person [outside the protected class]." Chipollini v. Spencer Gifts, Inc., 814 F.2d 893, 897 (3d Cir.), cert. dismissed, 438 U.S. 1052 (1987); see also Sempier v. Johnson & Higgins, 45 F.3d 724, 728 (3d Cir.) (same), cert. denied, 115 S. Ct. 2611 (1995); Torre, 42 F.3d at 830 (same).

In a further effort to fine-tune our jurisprudence on the subject, we have held that the fourth prong of the prima facie case should be "relaxed" when the employee's layoff occurred in the context of a reduction in force. Torre, 42 F.3d at 831. In such a situation, "it obviously is unnecessary for the plaintiff to . . . show that he was actually replaced by" someone outside the protected class. Massarsky, 706 F.2d at 118 n.13; see alsoDuffy v. Wheeling Pittsburgh Steel Corp., 738 F.2d 1393, 1395 n.3 (3d Cir.) (same), cert. denied, 469 U.S. 1087 (1984). Rather, "it is sufficient to show that he was discharged, while the [employer] retained someone [outside the protected class]." Healy v. New York Life Insurance Co., 860 F.2d 1209, 1214 n.1 (3d Cir. 1988), cert. denied, 490 U.S. 1098 (1989); see also DiBiase v. SmithKline Beecham Corp., 48 F.3d 719, 723 n.2 (3d Cir.), cert. denied, 116 S. Ct. 306 (1995); Torre, 42 F.3d at 831; Armbruster, 32 F.3d at 777; Billet v. CIGNA Corp., 940 F.2d 812, 816 n.3 (3d Cir. 1991); Duffy, 738 F.2d at 1395 n.2; Massarsky, 706 F.2d at 118.

### B. Reduction in workforce

We turn, first, to the threshold question of whether Ms. Marzano's employment was terminated as part of a reduction in workforce caused by financial distress, as Defendants claim. It is worth noting that this question bears not only on what legal standard governs Ms. Marzano's discrimination claim, but on her

two other claims as well.

The two parties disagree as to what is the appropriate work unit for us to consider in answering this question. Ms. Marzano argues that her employer at the time of her layoff was CSC Partners. She offers substantial evidence of CSC Partners's stellar financial performance in the years preceding and following her termination, including receipt of an Eagle Award for financial success in 1993 by the AT&T Business Unit. App. at A194-96; see Appellant's Brief at 9-12. In addition, she offers substantial evidence that CSC was also extremely profitable during the relevant time-period. Id. at 8-9. As a result, she suggests that Defendants' contention that she was laid off as the result of a reduction in workforce caused by financial distress is "not credible." Id. at 36.

Defendants do not challenge Ms. Marzano's rosy account of their financial picture, and do not claim that Ms. Marzano was laid off as part of a workforce reduction in either CSC as a whole or CSC Partners as a whole caused by either firm's financial situation. Appellees' Brief at 39. Rather, they note that from the time of her termination, Ms. Marzano was consistently told that her layoff was caused by the deteriorating financial situation of the division of CSC Partners for which she worked, the AT&T National Business Unit [the "AT&T Unit" or the "Unit"], as a result of which a workforce reduction was taking place within that unit. In her termination letter dated October 5, 1993, Ms. Marzano was specifically told:

> [R]evenues generated by the AT&T Business Unit have not materialized as anticipated. Over the past several months, our efforts to develop new business opportunities within AT&T have been largely unsuccessful. . . . [T]he CSC Consulting/AT&T Business Unit is forced to reduce the number of administrative personnel supporting the practice.

Letter from Marzi to Marzano of 10/5/93.

According to Defendants, "[b]etween October 1993 and April 1994, ten positions, including plaintiff's, out of approximately 50 located in the AT&T National Business Unit in New Jersey, were eliminated." Appellees' Brief at 10. Defendants also allege that the Unit was ultimately merged into another Partners unit, the NY Metro Business Unit. Id. at 13.

Ms. Marzano, however, argues that the Court should reject any argument made by Defendants based on the AT&T Unit's financial situation. She asserts that "[t]he purported AT&T Business Unit is not an independent unit," but "simply part of CSC Partners." Appellant's Brief at 14. Magistrate Judge Hughes, who reviewed the financial documents of both CSC Partners and the AT&T Unit in considering a discovery motion by Ms. Marzano, reached a similar conclusion. Marzano v. Computer Science Corporation, Inc., Civil No. 94-3102 (CSF) (D.N.J. June 22, 1995) (mem.) (Hughes, M.J.) [hereinafter Hughes Opinion].

Judge Hughes found, first of all, "evidence of other projects where AT&T worked in conjunction with several other units" of CSC Partners. Id., typescript at 5. The expenses and profits from these joint projects were credited to the AT&T

account, but "the other units were allowed to get 'shadow credit' for their efforts on this project." Id. As Judge Hughes explained, "[t]his is not indicative of what one would expect from an independent unit. Rather, it is more indicative of many aspects of a corporation coming together in order to benefit the collective body of the Partners organization." Id.

Judge Hughes also discussed evidence that the AT&T Unit's financial records incorporate the revenue of other supposedly independent units. Id. at 5. Judge Hughes found it "inexplicable how these profit and loss units can portray the revenues of other units as their own, while at the same time Defendants maintain the position that they are independent of each other." Id. at 5-6.

Finally, Judge Hughes expressed concern over testimony by employees of the defendants that suggests that profits from one unit, the "El Segundo" pseudo unit, were allocated to that unit, while expenses were allocated to some other unit, so that both units' financial pictures would offer a distorted picture of their profitability. Id. at 6.

Summarizing his findings, Judge Hughes explained that the AT&T Unit "has cooperated on projects with other units of Partners, it has been involved with the transfer of expenses and revenues between units, and it has had one of its more lucrative sections removed at a very convenient time." Id. at 7. Based on all this evidence, he reached the following conclusion:

> The AT&T unit does not reach the level of independence achieved by [separate, self-sufficient, independent portions of a corporation]. The AT&T unit was one of many symbiotic units, working, sharing and transferring their resources to each other, for the benefit of the whole. . . . All in all, it appears the AT&T unit is independent in name only.

Id.

While the defendants do not challenge the Magistrate Judge's various findings, they reject Ms. Marzano's conclusion and argue that the existence of the AT&T Unit "is simply beyond cavil." Appellees' Brief at 37. There is, indeed, ample evidence that CSC Partners contained a division that operated by that name. What is in dispute is whether the division was independent enough from the rest of CSC Partners to constitute an autonomous "unit," whose personnel actions and financial performance should or even could be considered separately from the rest of the firm. As to this issue, Judge Hughes certainly recognized that there is a question of fact regarding whether the AT&T Unit was an independent profit-and-loss center within the firm.

The defendants argue that their "sworn testimony which described the severe financial pressures facing the AT&T National Business Unit stands unrebutted." Id. at 36-37. Interestingly enough, the testimony to which they refer is that of Robert Marzi, whose deposition took place on April 25, 1995. App. at DAS 170. It is clear that the Magistrate Judge, for one, did not find Mr. Marzi's testimony "unrebutted," since nearly two months later he issued his opinion in which he concluded that "it appears the AT&T unit is independent in name only." And while it

is literally true, as the defendants claim, that "Judge Hughes did not find that the reduction-in-force was based on anything other than the financial statements of the AT&T National Business Unit," Appellees' Brief at 40, we are hard-pressed to find any significance to this fact, since the Magistrate Judge did not address this question in any way. Rather, the question before the Judge was whether the AT&T Unit "was a separate revenue generating profit and loss unit," Hughes Opinion, typescript at 2-3, and he expressed considerable doubt on the subject.

By casting doubt on the validity of the AT&T Unit's financial statements, Judge Hughes did in fact implicitly leave open the possibility that the reduction in force might have been based on something other than the financial statements, that there might not have been an independent AT&T Unit, that accordingly the Unit could not be in financial distress while the rest of CSC Partners was flourishing, and that therefore no reduction in force could occur as a result of the alleged unit's alleged financial distress. As Judge Hughes's opinion demonstrates, there is ample evidence in the record on the basis of which a finder of fact could conclude that the AT&T Unit's financial statements are of no value, and that the so-called AT&T Unit was merely a part of "the collective body of the Partners organization." Id. at 5. Based on this conclusion, a factfinder could further conclude that no valid and true reduction in force occurred in the unit since the unit had no independent existence of its own.

Because the district court conducted its analysis under the legal standard applicable to discrimination in a force-reduction setting, we presume that it concluded, as a matter of law, that a reduction of force did occur in the AT&T Unit. For the reasons just articulated, we conclude that the issue of whether the AT&T Unit was the appropriate work unit and whether a reduction in force did occur was a question of fact that should have been presented to the jury and which, on summary judgment, should be resolved in favor of the non-moving party, i.e., Ms. Marzano. We hold that the district court committed legal error when it failed to do so.

## C. Prima facie analysis

Because the district court could not conclude as a matter of law that a reduction in force (RIF) did occur, the court could only grant summary judgment for the defendants if it found that Ms. Marzano could not make a prima facie case of discrimination under either applicable legal setting -- i.e., reduction in force or no reduction in force. However, the court did not analyze Ms. Marzano's allegations in the context of a "straight" layoff (as opposed to a layoff which takes place in a RIF context). In addition, while the court did find that Ms. Marzano could not meet her prima facie burden in the RIF context, it committed legal error in reaching its conclusion.

### 1.

The district court concluded that Ms. Marzano could not make a prima facie case in the context of a reduction in force. The court correctly articulated the standard governing such

situations in the Third Circuit: "to demonstrate a prima faciecase '[i]n RIF cases, the plaintiff must show he was in the protected class, he was qualified, he was laid off and other unprotected workers were retained.'"  DiBiase, 48 F.3d at 723 n.2 (citing Armbruster, 32 F.3d at 777); see also Torre, 42 F.3d at 831; Seman v. Coplay Cement Co., 26 F.3d 428, 431 (3d Cir. 1994); Billet, 940 F.2d at 816 n.3.

The only dispute between the parties concerns the fourth prong of the requirement.  As the district court explained,

> Defendants argue that plaintiff cannot establish a prima facie case of pregnancy discrimination because she cannot demonstrate that her employer afforded more favorable treatment to nonpregnant employees.  Indeed, several nonpregnant employees were terminated in conjunction with the reduction in force of the AT&T National Business Unit, seemingly refuting plaintiff's claim that she was singled out because of her pregnancy.

> Plaintiff argues, however, that the relevant inquiry is not whether other persons outside the protected class were terminated, but whether persons not in the protected class were retained.

District Opinion, typescript at 5.

The district court acknowledged that our opinions on the subject have enunciated the standard in "the precise language articulated by plaintiff."  Id.  However, the court rejected a "literal interpretation" of our language on the ground that under such a test, "every plaintiff in a protected group would be allowed a trial simply because he was discharged during a reduction in force."  Id.  Presumably to protect the judiciary from a flurry of frivolous discrimination lawsuits by disgruntled laid-off employees, the court adopted a different requirement from that which our explicit language called for:

> [T]o establish a prima facie case in the context of a work-force reduction, a plaintiff must do more than merely show that unprotected employees were retained in their positions; the plaintiff must produce some additional evidence that he was singled out for discharge because of his protected status.

Id., typescript at 5-6.

Finding that "plaintiff has merely asserted that while she was terminated, other employees were retained," id., typescript at 6, the court concluded that Ms. Marzano had failed to establish a prima facie case of discrimination, and that as a result the defendants were entitled to summary judgment on this claim.

Because it departs from the law of this Circuit and because it subverts the analytical framework designed by the U.S. Supreme Court in McDonnell Douglas, we reject the requirement of "additional evidence" imposed by the district court on Ms. Marzano, and hold that the court erroneously concluded that Ms. Marzano had failed to meet her prima facie burden in the reduction-in-force context.

2.

As an initial matter, the district court was not free to depart from "the precise language" articulated by this court or to "decline[] to adopt the literal interpretation" of our jurisprudence unless, of course, a more recent Supreme Court case requires such a departure or our own precedent in other cases suggests a modification in certain circumstances. Defendants argue that the "additional evidence" requirement is consistent with Third Circuit precedent, and point for support to certain portions of our opinion in Hook v. Ernst & Young, 28 F.3d 366 (3d Cir. 1994). See Appellees' Brief at 28. However, the discussion in Hook to which they direct our attention concerns the elements required to show employment discrimination in a so-called "mixed-motives" case, and in no way bears on the elements of a primafacie case in the type of discrimination case that is before us, which is known as a "pretext" case. See Hooks, 28 F.3d at 375. In other words, Hooks is of no relevance to the instant case.

3.

We reject the "additional evidence" requirement not solely on hierarchical grounds, however, but also because it subverts the entire analytical framework constructed by the U.S. Supreme Court, this Court and other circuits for the consideration of summary judgment motions in employment discrimination cases.

(a)

What makes an employer's personnel action unlawful discrimination is the intent behind that action. See U.S. Postal Service Board of Governors v. Aikens, 460 U.S. 711, 715 (1983) ("The 'factual inquiry' . . . is '[whether] the defendant intentionally discriminated against the plaintiff.'") (citation omitted). For obvious reasons, it is extremely difficult -- not to say impossible -- to establish directly the motivation of one's employer, or that of any third party. See id. at 716 ("All courts have recognized that the question facing triers of fact in discrimination cases is both sensitive and difficult. . . . There will seldom be 'eyewitness testimony as to the employer's mental processes."). There are exceptions, of course, such as when a plaintiff can produce the proverbial "smoking gun" -- for instance, an internal memorandum instructing the personnel director not to hire persons belonging to a certain protected class. But our legal scheme against discrimination would be little more than a toothless tiger if the courts were to require such direct evidence of discrimination. As we explained in Chipollini, "we do not require direct proof of . . . discrimination because it is often unavailable or difficult to find. . . . 'Even an employer who knowingly discriminates on the basis of [protected status] may leave no written records revealing the forbidden motive and may communicate it orally to no one.'" 814 F.2d at 899 (citing LaMontagne v. American Convenience Products, Inc., 750 F.2d 1405, 1410 (7th Cir. 1984)).

As a result, most employment discrimination lawsuits seek to prove intent through inference. In the typical case, the plaintiff attempts to establish the employer's motivation by a process of elimination. In other words, because plaintiffs generally cannot present evidence affirmatively pointing to their

employer's actual reason for taking certain action against them, they must instead try to show that no reason other than discrimination is plausible, and that accordingly discrimination must have been the reason. To enable a jury to reach this conclusion, plaintiffs must establish three elements: (1) that their employer took an adverse employment action against them; (2) that the facts of the case are compatible with discrimination being the reason; (3) that the employer is unable to provide an alternative nondiscriminatory reason for the action, or that its stated reason is false. Since there must be some reason for the employer's action and since no reason other than discrimination has been shown to be plausible, this scheme allows a jury to infer that discrimination must be the reason.

The burden-shifting analysis enunciated by the Supreme Court in McDonnell Douglas and developed and refined in subsequent judicial forays into the subject is designed to ensure that plaintiff has enough evidence to construct the chain of inferences described in the previous paragraph, and therefore get to trial. In the first instance, the plaintiff must establish a prima facie case. The evidentiary burden at this stage is rather modest: it is to demonstrate to the court that plaintiff's factual scenario is compatible with discriminatory intent -- i.e., that discrimination could be a reason for the employer's action. As we have held on numerous occasions, this initial burden "is not intended to be onerous." Sempier, 45 F.3d at 728 (citing Burdine, 450 U.S. at 253); see also Torre, 42 F.3d at 829 (describing prima facie case as "relatively simple"); McKenna v. Pacific Rail Service, 32 F.3d 820, 825 (3d Cir. 1994) (same); Massarsky, 706 F.2d at 118 (describing prima facie case as "easily made out").

Jumping over this first hurdle, however, has important consequences. By meeting his or her prima facie burden, the plaintiff earns the right, as in a poker game, to require the employer to show its hand -- that is, to offer an explanation other than discrimination why the employee suffered an adverse employment action. It is as if plaintiff told the employer, "I cannot get into your mind to prove with certainty that you acted against me based on a discriminatory motive. You, on the other hand, know the reason why you acted against me. I have done the best I can, which is to show that discrimination could have been the motive. Therefore, it is your turn to prove me wrong by articulating the non-discriminatory reason for your action." If the employer is unable to proffer a nondiscriminatory reason, plaintiff is entitled to summary judgment or judgment as a matter of law, as the case may be; if the employer proffers a reason and the plaintiff can produce enough evidence to enable a reasonable factfinder to conclude that the proffered reason is false, plaintiff has earned the right to present his or her case to the jury.

In the context of a reduction in force, we have held that to demonstrate a prima facie case, "the plaintiff must show he was in the protected class, he was qualified, he was laid off and other unprotected workers were retained." DiBiase, 48 F.3d at 723 n.2; Armbruster, 32 F.3d at 777. The third element, that

plaintiff was laid off, establishes that he or she suffered an adverse employment action. The second and fourth elements, that plaintiff was qualified and that other unprotected workers were retained, establishes that plaintiff was treated differently from his or her colleagues, and introduces a question: Why? In other words, it raises the question of what is distinctive about plaintiff that caused the employer to treat him or her differently from his or her colleagues. The first element, that she was in the protected class, identifies one possible answer, one condition in which she differs from her colleagues who were retained: her protected status. It does not necessarily demonstrate that her protected status is the reason why she was treated differently; but it makes it a plausible explanation, one that is compatible with the facts of the case.

At that point, the burden switches to the employer, who must proffer an alternative explanation for treating the plaintiff differently from those unprotected employees who were retained. Chief Justice (then Justice) Rehnquist explained the reason for placing that burden on the employer as follows:

A prima facie case under McDonnell Douglas raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors. And we are willing to presume this largely because we know from our experience that more often than not people do not act in a totally arbitrary manner, without any underlying reasons, especially in a business setting. Thus, when all legitimate reasons for rejecting an applicant have been eliminated as possible reasons for the employer's actions, it is more likely than not the employer, who we generally assume acts only with some reason, based his decision on an impermissible consideration such as race.

Furnco Construction Corp. v. Waters, 438 U.S. 567, 577 (1978); see also Chipollini, 814 F.2d at 897.

When the employer proffers a reason for treating the plaintiff differently from his or her colleagues that the factfinder rejects, McDonnell Douglas and its progeny allow the factfinder to conclude that since the employer was unable to give any satisfactory reason for its action, the discriminatory reason suggested by the plaintiff must be the one.

As noted earlier, the district court rejected the primafacie test that we articulated in Armbruster on the ground that "every plaintiff in a protected group would be allowed a trial simply because he was discharged during a reduction in force," District Opinion at 5, and therefore held that Ms. Marzano needed to produce "additional evidence" to meet her prima facie burden. Id. at 6. In so concluding, the court committed reversible legal error.

(b)

First of all, the court is simply wrong when it suggests that our test would open the judicial floodgates and let every plaintiff in a protected group who is discharged go to trial and defeat summary judgment. Rather, the effect of our rule is that

in every case where an employee in a protected class is laid off as part of a reduction in force while unprotected colleagues are retained, the employer may be compelled to state the nondiscriminatory reason -- assuming there is one -- for the action.

It is true that if plaintiff can then produce evidence to cast doubt on the employer's stated reason, the case should go to trial. But such is the nature of the evidentiary beast. Employment discrimination cases center around a single question: why did the employer take an adverse employment action against plaintiff? Because this "is clearly a factual question," Chipollini, 814 F.2d at 899, summary judgment is in fact rarely appropriate in this type of case. Simply "by pointing to evidence which calls into question the defendant's intent, the plaintiff raises an issue of material fact which, if genuine, is sufficient to preclude summary judgment." Id. See Sempier, 45 F.3d at 732-33 (cases in which plaintiff attacks employer's stated reasons for adverse employment action "must be resolved by a jury and cannot be resolved on summary judgment").

To require plaintiff to produce "additional evidence" of discrimination at the prima facie stage, as the district court did in this instance, would be a cure worse than the disease. It would topple the complex evidentiary edifice constructed by the Supreme Court, and impose on plaintiff the very burden that McDonnell Douglas sought to avoid -- that of uncovering a smoking gun.

The defendants contend that the standard articulated by the court "does not require, as plaintiff suggests, a 'smoking gun.'" Appellees' Brief at 29. As to what other type of evidence might satisfy the "additional evidence" requirement that the district court enunciated, however, the Defendants do not say; instead, they cite several cases from other circuits with no comment. None of these cases, however, comes close to offering an answer. See, e.g., Bialas v. Greyhound Lines, Inc., 59 F.3d 759, 763 (8th Cir. 1995) (requiring plaintiff to "come forward with additional evidence that age was a factor in his termination," without specifying what form this "other evidence" might take).

> The Eighth Circuit, in an earlier case, did suggest that [s]uch showing could be made . . . by statistical evidence (as, for example, where a pattern of forced early retirement or failure to promote older employees can be shown) or circumstantial evidence (such as a demonstration of a preference for younger employees in the business organization.

Holley v. Sanyo Manufacturing, Inc., 771 F.2d 1161, 1166 (8th Cir. 1985).

However, we find this answer unsatisfactory in the present context. First, except in the largest organizations it might be more difficult to compile meaningful statistics regarding pregnant women than for older employees. Second, we find the imposition of such a requirement overly onerous at the prima facie stage. For this reason, we predict that New Jersey would decline to follow the lead of those federal circuits that have adopted the "additional evidence" requirement.

Defendants argue that the district court properly required "additional evidence," but offer, inter alia, a more nuanced argument than that articulated by the court. They argue that the fourth element of the prima facie case "encompasses the requirement that plaintiff show that similarly situatedunprotected employees were retained." Appellees' Brief at 26 (citing Torre, 42 F.3d at 831), and that there were no such similarly situated employees in the AT&T Unit. Appellees' Brief at 27. The implication, the defendants argue, is that

> because of her unique role, plaintiff cannot establish, as she must, that other similarly situated, unprotected employees were retained.

> Because plaintiff was unable to show that other similarly situated, unprotected employees were treated more favorably, the District Court correctly ruled that plaintiff must make some "additional showing" of discrimination . . . .

Id. at 27-28.

We reject Defendants' argument. First of all, Torre did not create any legal requirement such as the one that Defendants attempt to impose on Ms. Marzano. The Court in that case simply remarked that "when Torre was terminated in the reduction in force, other, similarly-situated [sic] but younger employees were retained by Casio." Torre, 42 F.3d at 831. The fact that similarly situated employees were retained certainly strengthens the plaintiff's case, and makes more urgent the employer's task of providing a reason other than discrimination for its different treatment of plaintiff. But the Court did not create a new legal requirement in the process, and Defendants can cite no case in this Circuit, nor do we know of any, where it was described as a requirement.

Moreover, we reject Defendants' argument because it would seriously undermine legal protections against discrimination. Under their scheme, any employee whose employer can for some reason or other classify him or her as "unique" would no longer be allowed to demonstrate discrimination inferentially, but would be in the oft-impossible situation of having to offer direct proof of discrimination. We see no value in, and no mandate in our jurisprudence for, such a requirement.

This is not to say that the "uniqueness" of an employee is irrelevant to the ultimate outcome. Consider, for instance, the situation of an employee who performs tasks in the firm that no one else performs, and whose functions become obsolete. In that case, the employee's "uniqueness" may explain why he or she, and not an unprotected colleague, was terminated. Such a scenario, however, goes to the employer's reason for its action, and may be presented to the judge after the plaintiff has made his or her prima facie case, when the burden switches to the employer to proffer a nondiscriminatory reason for its action.

All employees can be characterized as unique in some ways and as sharing common ground with "similarly situated employees" in some other ways, depending on the attributes on which one

focusses, and the degree of specificity with which one considers that employee's qualifications, skills, tasks and level of performance.  The relevant issue for our purposes is not whether there is some way in which an employee can be classified as unique but, rather, whether the employee can be classified as unique in some way relevant to his or her layoff.  This question, in turn, cannot be considered independently from the reasons proffered for the employee's termination.  Therefore, arguments as to the employee's uniqueness should be considered in conjunction with, and as part of, the employer's rebuttal -- not at the prima facie stage.  See Healy, 860 F.2d at 1214 n.1 (noting that "because the prima facie case is easily made out, the prima facie case is rarely the focus of the ultimate disagreement.  Rather, 'the exigencies of a reduction-in-force can best be analyzed at the stage where the employer puts on evidence of a non-discriminatory reason for the [discharge].") (citing Coburn v. Pan American World Airways, Inc., 711 F.2d 339, 343 (D.C. Cir.), cert. denied, 464 U.S. 994 (1983)).

(d)

Because we conclude that the test that this Court has articulated in the past to establish a prima facie case of employment discrimination in a reduction-in-force context properly advances the evidentiary scheme devised by the Supreme Court, and because we find that this test satisfactorily protects the interests of employer and employee, we believe that New Jersey would adopt the test articulated by this Court in DiBiaseand Armbruster, and find that the district court erred when it rejected established Third Circuit law.

4.

Furthermore, because we find that the district court improperly concluded that Ms. Marzano could not meet her primafacie burden in the RIF context, and because the court did not consider whether she could meet her burden in a non-RIF context, we hold that the district court erroneously granted Defendants' summary judgment on the discrimination ground and remand for further consideration.

V. The Family & Medical Leave Act claim

Ms. Marzano's second claim is that the defendants violated her right, under the New Jersey Family Leave Act, "to family leave . . . [and] to be restored by [the defendants] to [her previous position] or to an equivalent position of like seniority, status, employment benefits, pay, and other terms and conditions of employment."  N.J.S.A.  34:11B-7.  While the Act does contain an exception when "the employer experiences a reduction in force or layoff and the employee would have lost his position had the employee not been on leave," id., Ms. Marzano argues that the exception does not apply because the defendants' claim of financial distress, which was the stated reason for the alleged force reduction, is false.

The district court rejected Ms. Marzano's argument that a genuine issue of material fact existed on the ground that she could not defeat the motion for summary judgment

simply by challenging the employer's motivation for

reducing its work force.  Regardless of whether it was financially induced or whether it was motivated by some other legitimate business reason, there is no dispute that Partners experienced a reduction in force during the time plaintiff was out on maternity leave.

Op. at 7-8.  The district court concluded that the force-reduction provision of the Family & Medical Leave Act applied, and that summary judgment was warranted.  Id.

As we discussed at length supra in Part IV, there is a genuine question of fact regarding whether or not Ms. Marzano's employer experienced a reduction in force.  Therefore, we cannot conclude on this record that the statutory exception applies to Ms. Marzano's termination.

### VI. The breach-of-contract claim

Ms. Marzano's final allegation is that her layoff was in breach of an implied contract whereby "an employee is entitled to be restored to the same or equivalent position after taking maternity leave."

The district court granted summary judgment on this claim on two grounds.  First, the court found that "plaintiff has failed to identify a written policy wherein her employer impliedly promised that any employee taking a family leave of absence would be restored to the position held prior to commencing the leave period."  District Opinion at 9.  Second, the court concluded that "a breach of implied contract claim . . . is not cognizable in the context of a work force reduction."  Id. at 9.

Ms. Marzano grounds her claim in New Jersey common law, under which

when an employer of a substantial number of employees circulates a manual that, when fairly read, provides that certain benefits are an incident of employment (including, especially, job security provisions), the judiciary, instead of "grudgingly" conceding the enforceability of those provisions, should construe them in accordance with the reasonable expectations of the employees.

Woolley v. Hoffmann-La Roche, Inc., 491 A.2d 1257, 1264 (N.J. 1985).

She argues that the court erroneously granted summary judgment on this count because, inter alia, a memorandum circulated on August 16, 1993 by CSC Partners management to all employees "expressly states that an employee is entitled to be restored to the same or equivalent position after taking family leave," Appellant's brief at 49, and "[b]ased on that policy, [she] reasonably expected to be returned to her job after taking family leave."  Id.

There is no categorical test to determine whether an employment manual could give rise to reasonable expectations of employees that it confers enforceable obligations.  Witkowski v. Thomas J. Lipton, Inc., 643 A.2d 546, 550 (N.J. 1994).  Among the important factors that the court should consider, however, are "the definiteness and comprehensiveness of the [policy] and the context of the manual's preparation and distribution."  Id.

In this instance, the document to which Ms. Marzano directs our attention is not an employment manual but a two-page memorandum, a far less formal document. In addition, while the memorandum does state, inter alia, that "[a]n employee returning from FMLA leave is entitled to be restored to the same position held prior to taking FMLA leave, or to an equivalent position, with the same pay and benefits," App. at A267, it is very clear from the text of the memorandum that this sentence merely notifies employees of a provision contained in the Family and Medical Leave Act. In other words, the context of the memorandum was to apprise CSC Partners employees of their rights under New Jersey law, not to inform them of any new "benefits" that the company decided to grant its employees.

For this reason, we conclude that the district court properly granted summary judgment on this count.

VII. CSC's liability

Defendants argue on appeal that Ms. Marzano improperly named Computer Science Corp. as a defendant and that the claims against CSC must be dismissed as a result. Appellees' Brief at 46-47. Ms. Marzano argues, however, that there is a "genuine issue of material fact regarding the interrelationship of CSC and CSC Partners," Appellant's Reply Brief at 24, and that accordingly CSC was properly named as a defendant. Id. at 22.

It is a "fundamental proposition[]" of New Jersey corporate law that a corporation is a separate entity from its shareholders, State of New Jersey v. Ventron Corp., 468 A.2d 150, 164 (N.J. 1983) (citing Lyon v. Barrett, 89 N.J. 294, 300 (1982)), and that shareholders are insulated from the liabilities of the corporate enterprise. Ventron Corp., 468 A.2d at 164. "Even in the case of a parent corporation and its wholly-owned subsidiary, limited liability normally will not be abrogated." Id. (citing Muller v. Seaboard Commercial Corp., 5 N.J. 28, 34 (1950)).

A court may not depart from this principle and pierce the corporate veil unless it finds that "a subsidiary was 'a mere instrumentality of the parent corporation.'" Ventron Corp., 468 A.2d at 164 (citing Mueller, 5 N.J. at 34-35). The requisite finding is that "the parent so dominated the subsidiary that it had no separate existence but was merely a conduit for the parent." Ventron Corp., 468 A.2d at 164.

We are aware of no case in New Jersey or the Third Circuit on the subject of piercing the corporate veil in the context of an employment discrimination lawsuit. Other courts, however, have considered the issue. Closest to home, a Pennsylvania federal district court held that "[w]here separate corporate entities are so interrelated and integrated in their activities, labor relations, and management, it is clear that for Title VII jurisdictional purposes they may be treated as a single employer." Ratcliffe v. Insurance Co. of North America, 482 F. Supp. 759, 764 (E.D. Pa. 1980).

Other courts have addressed similar questions and conducted similar types of analysis. In Johnson v. Flowers Industries, Inc., 814 F.2d 978 (4th Cir. 1987), the plaintiffs brought an age

discrimination lawsuit against the company that employed them, West Virginia Baking Company (WVBC), as well as WVBC's parent-company, Flowers Industries, and another Flowers subsidiary. The court, after noting that "when a subsidiary hires employees, there is a strong presumption that the subsidiary, not the parent company, is the employer," id. at 980, noted that the presumption could be overcome if the parent-company "exercises excessive control in one of two ways." Id. at 981.

> First, the parent could control the employment practices and decisions of the subsidiary. If the parent company hired and fired the subsidiary employees, routinely shifted them between the two companies, and supervised their daily operations, it would be hard to find that the parent was not their employer. Second, the parent might so dominate the subsidiary's operations that the parent and the subsidiary are one entity and thus one employer. For example, the subsidiary may be highly integrated with the parent's business operations, as evidenced by the commingling of funds and assets, the use of the same work force and business offices for both corporations, and the severe undercapitalization of the subsidiary. The parent might also fail to observe such basic corporate formalities as keeping separate books and holding separate shareholder and board meetings.

Id. The court concluded that "the courts have found parent corporations to be employers only in extraordinary circumstances." Id.; see also Frank v. U.S. West, Inc., 3 F.3d 1357, 1363 (10th Cir. 1993) (same).

In Daniels v. Kerr McGee Corp., 841 F. Supp. 1133 (D. Wyo. 1993), the plaintiff sought to pierce the corporate veil against his employer's parent-company in his wrongful discharge action based on several facts demonstrating interrelatedness: interlocking directorates between the two corporate entities; reference in the parent's annual report to the operations of the subsidiary, and inclusion of the revenues generated by the subsidiary; management by the parent of the benefit plan for the subsidiary's employees; use of the same corporate logo; shared corporate headquarters; medical examination of the plaintiff by a doctor employed by the parent. Id. at 1136-37. The court, while acknowledging that "there is some degree of interdependence between these two corporations," concluded that the facts cited by plaintiff could not "overcome the strong presumption of liability." Id. at 1137. The court noted that plaintiff conceded that he was an employee of the subsidiary only, that the subsidiary was adequately capitalized and had sufficient assets to satisfy any potential judgment against it, and that "the decision to terminate the plaintiff was made by the management of the subsidiary and that the parent had no role in that decision." Id.

By contrast, the Court of Appeals for the Second Circuit did pierce the corporate veil in a lawsuit alleging improper termination on the grounds that the parent-company "dominated" its subsidiary and "effectuated [the plaintiffs'] discharges,"

and that the employees were terminated as the result of personnel actions ordered by the CEO and the Board of the parent-company. Gorrill v. Icelandair/Flugleidir, 761 F.2d 847, 853 (2d Cir. 1985).

In the instant case, it is undisputed that at the time of her layoff, Ms. Marzano was an employee of CSC Partners, and CSC Partners only. While she suggests that there is a question of fact regarding the interrelatedness of the two companies that should go to the jury, Appellant's Reply Brief at 23, she points only to the following evidence to support her position: first, that she was initially hired by CSC, and "continued to believe she was a CSC employee until the day she was fired," id.; second, that while Defendants claim that her division merged with CSC Partners sometime between 1991 and 1992, "from the employee's perspective, there was no notice of any changes or explanation of what [the merger] meant, if anything," id. at 24; third, that she continued to receive paychecks from CSC as late as May 1992, and continued to belong to the CSC pension plan, id.; fourth, that "CSC Partners['s] maternity leave policy was based on information provided by CSC Corporate on the FMLA," id.; and, finally, that she continued to have regular involvement with CSC corporate as part of her job responsibilities." Id.

Even if we accept all of Ms. Marzano's statements as true, we conclude that these facts, taken together, do not demonstrate that CSC and CSC Partners were "so interrelated and integrated in their activities, labor relations and management" that we should pierce the corporate veil. Her only direct involvement with CSC at the time of her layoff was her participation in CSC's pension plan. In addition, she offers no evidence that CSC was in any way, shape or form involved in CSC Partners' management or personnel decisions. For this reason, we conclude that the charges against CSC should be dismissed.

## VIII. Conclusion

For the reasons expressed above, we reach the following conclusions. First, we will affirm the grant of summary judgment for CSC Partners on the breach-of-contract count. Second, we will vacate the grant of summary judgment for CSC Partners on the discrimination count, and remand to the district court for further action consistent with this opinion. Third, we will reverse the grant of summary judgment for CSC Partners on the FMLA count, and remand to the district court to proceed to trial on this issue. Finally, we will remand and instruct the district court to enter an order dismissing all the claims against CSC.