Wayne ZIEGLER

v.

**DELAWARE COUNTY DAILY TIMES a Division of the Goodson Holding Company, et al.**

**Civil Action No. 00–817.**

United States District Court, E.D. Pennsylvania.

Feb. 5, 2001.

Sharon Ann Ziegler, Chadds Ford, PA, for plaintiff.

Lawrence C. DiNardo, Laura C. Fisher, Seyfarth Shaw Fairweather & Geraldson, Chicago, IL, for defendant.

## MEMORANDUM

DALZELL, District Judge.

In this case, a 62 year old man brings claims of age discrimination in connection with his termination as circulation director of the *Delaware County Daily Times*. We here consider the defendants' motion for summary judgment.

### I. *Factual Background*[1]

Plaintiff Wayne Ziegler, who was born on July 2, 1938, in 1977, after spending the

---

1. While the parties have differences with respect to some parts of the record, the back- ground facts outlined below are undisputed.

previous seventeen years in various aspects of the newspaper business, accepted a position with the *Delaware County Daily Times* (the *"Daily Times"*) as Circulation Manager. The following year, the *Daily Times* promoted him to the position of Circulation Director, the position he held until his termination twenty years later. As Circulation Director, Ziegler was in charge of all aspects of the circulation department, including home delivery, single copy purchases[2], and distribution. Ziegler reported directly to the *Daily Times*'s publisher.[3] The *Daily Times*'s publisher was and is Frank Gothie, who has held that position since 1986.

From 1989 until 1998, Goodson Newspaper Group owned the *Daily Times*. In February or March, 1998, a newspaper broker contacted the Journal Register Company ("JRC") and reported that the Goodson Newspaper Group's papers were for sale. JRC is a publicly-traded[4] corporation that owns and operates well over one hundred newspapers[5] nationwide. On May 17, 1998, JRC entered into a contract to purchase the Goodson Newspaper Group, which then included newspapers in Massillon, Ohio, Oneida, New York, Kingston, New York, Ardmore and Pottstown, Pennsylvania, as well as the *Daily Times*.[6] The sale closed on July 15, 1998.

Immediately following the closing, Ziegler, then sixty years old, was terminated as Circulation Director of the *Daily Times*. Michael Starn, then thirty-six years old, replaced him. This action followed.

## II. *Procedural History*

### A. *Plaintiff's Claims*

In his Complaint, Ziegler claims age discrimination against the *Delaware County Daily Times*, JRC, Robert Jelenic (JRC's CEO), and William Higginson (JRC's Vice–President of Production). Counts 1 (against the *Daily Times*) and 2 (against JRC) allege that these firms violated the Age Discrimination in Employment Act (ADEA) and the Pennsylvania Human Relations Act (PHRA) in that their decision to terminate Ziegler was based in whole or in part on his age. Counts 3 (against Robert Jelenic) and 4 (against William Higginson) allege that these men violated the PHRA, and in particular 43 Pa. Stat. Ann. § 955(e), by aiding, abetting, inciting, compelling, and/or coercing Ziegler's wrongful age-based termination, or by obstructing or preventing people from complying with the ADEA or PHRA.

### B. *Defendant's Motion for Summary Judgment*

After the close of discovery, the defendants[7] filed for summary judgment as to all counts. With respect to Count 2, defendants argue that JRC was not Ziegler's employer and therefore cannot be held liable under the ADEA or the PHRA for an allegedly discriminatory employment action. With respect to both Counts 1 and 2, defendants contend that they have prof-

---

**2.** As from a newsstand.

**3.** At the *Daily Times,* the office of publisher is at the pinnacle of the management hierarchy; the publisher is essentially the paper's Chief Executive Officer.

**4.** On the New York Stock Exchange.

**5.** Both daily and non-daily. For the sake of clarity, when in this memorandum we refer to the *Daily Times,* we refer to the newspaper for which Ziegler worked for twenty-one years, recognizing that it was not a separate juridical entity, but only a division of Goodson Newspaper Group. *See also* n. 6, following.

**6.** The actual contract of purchase involved the purchase of the stock of holding corporations, but there is no dispute that the acquisition amounted to the Journal Register Company's purchase of the Goodson Newspaper Group, and that the *Daily Times* was among the papers acquired. *See* Ex. 5, Pl.'s Mem. of Law (an SEC form 8–K/A that includes the 57–page Master Agreement Governing the sale).

**7.** All of whom represented by the same counsel.

fered a legitimate, non-discriminatory explanation for Ziegler's termination, and there is no showing that this explanation was a pretext. Defendants also urge that Counts 3 and 4 are procedurally barred for failure to exhaust administrative remedies, and that, moreover, Counts 3 and 4 fail because there is no showing that Jelenic or Higginson in fact aided or abetted any unlawful discriminatory practice.

### III. *Analysis*[8]

#### A. *Overview of Employment Discrimination Law*

We begin with the legal structure under which our analysis must progress.

Under the ADEA, it is "unlawful for an employer ... to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). When a plaintiff alleges disparate treatment, "liability depends on whether the protected trait (under the ADEA, age) actually motivated the employer's decision." *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993). That is, the plaintiff's age must have "actually played a role in [the employer's decisionmaking] process and had a determinative influence on the outcome." *Ibid.*

*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 120 S.Ct. 2097, 2105, 147 L.Ed.2d 105 (2000).

■ Claims under the ADEA and PHRA[9] are assessed using the analytical framework developed for Title VII claims under *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) and *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and their progeny, *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1108 (3d Cir.1997).

Under *Price Waterhouse*, "if a plaintiff 'show[s] by *direct evidence* that an illegitimate criterion was a substantial factor in the decision,' the burden of persuasion shifts to the employer 'to show that the decision would have been the same absent discrimination.'" *Keller*, 130 F.3d at 1113 (quoting *Price Waterhouse*, 490 U.S. at

---

**8.** A summary judgment motion should only be granted if we conclude that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law," Fed.R.Civ.P. 56(c). In a motion for summary judgment, the moving party bears the burden of proving that no genuine issue of material fact is in dispute, *see Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585 n. 10, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), and all evidence must be viewed in the light most favorable to the nonmoving party, *see id.* at 587, 106 S.Ct. 1348. Once the moving party has carried its initial burden, then the nonmoving party "must come forward with 'specific facts showing there is a genuine issue for trial,'" *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348 (quoting Fed.R.Civ.P. 56(e)) (emphasis omitted); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (holding that the nonmoving party must go beyond the pleadings to show that there is a genuine issue for trial).

The mere existence of some evidence in support of the nonmoving party will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). However, we must "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pennsylvania Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir.1995).

**9.** "In employment discrimination cases, Pennsylvania courts utilize the analytical model adopted by the United States Supreme Court in [*McDonnell Douglas*]," *Campanaro v. Pennsylvania Elec. Co.*, 738 A.2d 472, 476 (Pa.Super.1999) (citing *Fairfield Township Volunteer Fire Co. No. 1 v. Commonwealth*, 530 Pa. 441, 609 A.2d 804, 805 (1992)). Pennsylvania courts have also looked to *Price Waterhouse* in assessing claims that a plaintiff has direct evidence of discrimination, *Taylor v. Pennsylvania Human Relations Comm'n*, 681 A.2d 228, 232 (Pa.Cmwth.1996).

276, 109 S.Ct. at 1804 (O'Connor, J., concurring)) (emphasis in *Keller*) [10].

Alternatively, the *McDonnell Douglas* analytic model permits a plaintiff to go forward in the absence of direct evidence of discrimination. The *McDonnell Douglas* model consists of three steps. "First, the plaintiff must produce evidence that is sufficient to convince a reasonable factfinder to find all of the elements of a prima facie case," *Keller*, 130 F.3d at 1108. If the plaintiff makes such a showing, we move to step two. "The burden of production (but not the burden of persuasion) shifts to the defendant, who must then offer evidence that is sufficient, if believed, to support a finding that it had a legitimate, nondiscriminatory reason for the discharge," *Keller*, 130 F.3d at 1108. If the defendant cannot satisfy this burden, we enter judgment for the plaintiff. Conversely, if the defendant satisfies the burden, the presumption of discrimination created by the prima facie case disappears, *Reeves*, 120 S.Ct. at 2106, and we then proceed to step three. In step three, the plaintiff must submit evidence from which the factfinder could find that the defendant's allegedly legitimate reason was a pretext for discrimination, *Reeves*, 120 S.Ct. at 2106.

The assessment of the defendants' motion for summary judgment that follows will track these analytic steps.

B.  *The Journal Register Company's Status as a Proper Defendant*

Before beginning our discussion of the *Price Waterhouse* or *McDonnell Douglas* frameworks, we must first address a threshold question, namely, whether JRC was Ziegler's employer for purposes of liability under the ADEA or PHRA. In their motion for summary judgment, defendants argue that in order for JRC to be liable under Count 2, we must first find that JRC was Ziegler's employer, since liability for Ziegler's termination under the PHRA or ADEA lies with his employer. In response, Ziegler argues that JRC, as the *Delaware County Daily Times's* corporate parent at the time Ziegler was terminated, was in fact Ziegler's employer [11].

10. We note that after *Price Waterhouse* was decided, Congress in 1991 amended the Civil Rights Act of 1964 to provide that an unlawful employment practice is established when a plaintiff shows that "race, color, religion, sex, or national origin was a motivating factor for any employment practice," *Zubi v. AT&T Corp.*, 219 F.3d 220, 224 (3d Cir.2000) (quoting Pub.L. No. 102–166, § 107(a), 105 Stat. 1071, 1076 (1991)). This amendment therefore rejected the *Price Waterhouse* "but-for" test for certain types of discrimination. However, courts continue to analyze age discrimination claims under the ADEA using the *Price Waterhouse* test in the wake of the 1991 amendments, *Armbruster*, 32 F.3d at 778 (addressing an ADEA claim and employing *Price Waterhouse* analysis while referring to "a case unaffected by the Civil Rights Act of 1991").

11. Ziegler does not dispute the proposition inherent in the defendants' argument that JRC's liability under the ADEA or PHRA pursuant to Count 2 can lie only if JRC was Ziegler's employer. We observe that 29 U.S.C. § 623(a) and 43 Pa. Stat. Ann. § 955(a) do both specify "employer" in prohibiting discharge on the basis of age.

We also observe that 43 Pa. Stat. Ann. § 955(e) (the statute that forms the basis for Counts 3 and 4) does bar "any person, employer, employment agency, labor organization or employe" from aiding or abetting in discriminatory practices. However, to the extent that this might apply to actions taken by JRC as a corporate entity (even if it were not Ziegler's employer *per se*) Ziegler has made no such "aid and abet" allegations in the Complaint against JRC pursuant to 43 Pa. Stat. Ann. § 955(e), reserving those charges for Robert Jelenic and William Higginson. Likewise, Ziegler has presented no argument whatsoever in his briefing related to such a claim against JRC. Cf. *Dici v. Commonwealth*, 91 F.3d 542, 552 (3d Cir.1996) (noting that some aspects of liability under the PHRA, and particularly liability under § 955(e) extend beyond that provided for in Title VII).

Similarly, we also observe that some federal courts have interpreted the phrase "or otherwise discriminate" contained in 42 U.S.C § 2000e–2(a)(1) to mean that any employer may be held liable under Title VII for interfering with an employment relationship, even if the plaintiff was not actually the employee of the defendant, *e.g.*, *Kemether v. Pennsylvania Interscholastic Athletic Ass'n*, No. 96–6986, 1999 WL 1012957 (E.D.Pa. Nov.8, 1999) at *11 n. 17 (citing cases from other circuits).

*Marzano v. Computer Science Corp.*, 91 F.3d 497 (3d Cir.1996)[12] addressed the circumstances under which a corporate parent and one of its subsidiaries can be treated as a single employer for purposes of employment discrimination law.[13] In *Marzano*, our Court of Appeals essentially analyzed this question as analogous to the question of piercing the corporate veil in the particular circumstances of employment, and looked initially to applicable state law[14] for guidance.

In Pennsylvania[15], there is a strong presumption against piercing the corporate veil, *Miners, Inc. v. Alpine Equip. Corp.*, 722 A.2d 691, 694 (Pa.Super.1998) (citing *Lumax Indus., Inc. v. Aultman*, 543 Pa. 38, 669 A.2d 893, 895 (1995)). Pennsylvania courts have also recognized[16] that there are two separate types of veil piercing theories: the "alter ego" theory, in which a plaintiff seeks to hold a controlling owner of a corporation liable, and "single entity" theory, in which a plaintiff argues that two corporations share common ownership and are in fact operating as a single corporate combine.[17] With respect to "alter ego" veil piercing, "factors which may, at times, justify disregarding the corporate form and holding the shareholder(s) liable include intermingling of personal and corporate affairs, undercapitalization, failure to adhere to corporate formalities, or using the corporate form to perpetrate a fraud," *Commonwealth v. Vienna Health Prods., Inc.*, 726 A.2d 432, 434 (Pa.Cmwlth.1999). In "single entity" veil piercing, "two or more corporations are treated as one because of identity of ownership, unified administra-

---

The same phrase—"or otherwise discriminate"—also appears in 29 U.S.C. § 623(a). However, it does not appear that our Court of Appeals has adopted this interpretation with respect to Title VII, *see Krouse v. American Sterilizer Co.*, 984 F.Supp. 891, 907 (W.D.Pa. 1996) (noting that the Third Circuit has not explicitly done so), much less with respect to ADEA. In the absence of any argument from the parties regarding this involved legal question, we decline to analyze it or consider it *sua sponte*.

We take the time to recognize these possible, but evidently eschewed, legal theories only because Ziegler's claim against Robert Jelenic, JRC's CEO, could suggest that Ziegler also might seek to hold JRC liable as a corporate entity for aiding and abetting discrimination or otherwise interfering in Ziegler's relationship with the *Daily Times*. However, as we have said above, Ziegler raises no claims of "aiding and abetting" under the PHRA against JRC in the Complaint, and makes no argument in his briefs here that JRC's ADEA liability might arise from anything other than its status as Ziegler's employer. In opposition to defendants' summary judgment motion Ziegler argues solely (in fifteen pages of text devoted to this issue) that JRC should be considered Ziegler's employer under the legal tests we will discuss in the text below. Thus, as the parties, and particularly the plaintiff, have not presented or addressed any of these nuances in discrimination law, we consequently are left only to resolve the question outlined in the text: whether JRC was Ziegler's employer.

**12.** Although *Marzano* was decided in the context of a Title VII suit, we find it equally applicable to our ADEA context.

**13.** As noted in the margin above, JRC came to control the *Daily Times* by virtue of a transaction in which JRC purchased the stock of the *Daily Times*'s parent organization. There appears to be no dispute between the parties on the point that the *Daily Times* was a subsidiary of JRC.

**14.** In *Marzano*, the applicable state law was New Jersey's.

**15.** The parties do not detail, and it is not immediately apparent from the record, where the *Daily Times*'s corporation—that is, the holding corporation controlling the *Daily Times* that JRC bought on July 15, 1998—is incorporated. We therefore will default to the application of forum law, which has the advantage of being the state where the *Daily Times* conducts its business. In any event, we cannot see how minor jurisdictional differences in corporate veil-piercing law would affect our analysis here.

**16.** But not necessarily adopted, as we will note below.

**17.** We note that we have been unable to locate any Pennsylvania case discussing veil piercing in the employment discrimination context.

tive control, similar or supplementary business functions, involuntary creditors, and insolvency of the corporation against which the claim·lies," *Miners, Inc.,* 722 A.2d at 695.[18]

In addition to looking to state corporate law, the *Marzano* panel looked to decisions in other circuits, and quoted at length from *Johnson v. Flowers Indus., Inc.,* 814 F.2d 978 (4th Cir.1987), in which the Fourth Circuit held that the presumption that a corporate subsidiary, and not the parent, was the individual's employer could be overcome in one of two ways:

> First, the parent could control the employment practices and decisions of the subsidiary. If the parent company hired and fired the subsidiary employees, routinely shifted them between the two companies, and supervised their daily operations, it would be hard to find that the parent was not their employer. Second, the parent might so dominate the subsidiary's operations that the parent and the subsidiary are one entity and thus one employer. For example, the subsidiary may be highly integrated with the parent's business operations, as evidenced by the commingling of funds and assets, the use of the same work force and business offices for both corporations, and the severe undercapitalization of the subsidiary. The parent might also fail to observe such basic corporate formalities as keeping separate books and holding separate shareholder and board meetings.

*Marzano,* 91 F.3d at 513 (quoting *Johnson,* 814 F.2d at 981).

■ With this guidance, we now move to examine the relationship between JRC and the *Daily Times.* As *Marzano* makes clear, we begin with the presumption that the corporate parent is *not* the employer, and we will consequently proceed by canvassing the validity of Ziegler's arguments as to why the veil should be pierced.

We should note at the outset that there is no claim here that JRC ever directly employed Ziegler. To the extent that Ziegler was "employed" by JRC for ADEA purposes, it was through the *Daily Times.*[19] Consequently, the only time in which Ziegler could have been a JRC employee was in the few hours between the closing of the sale of the Goodson Newspaper Group to JRC and Ziegler's termination, Ex. D, Defs.' Mem. of Law (Dep. of Frank Gothie) at 124–25 (noting that he was informed that closing had occurred by a phone call in the late morning of July 15, 1998 and that "shortly" afterward he began the process of informing the four terminated *Daily Times* employees, including Ziegler).

In any event, Ziegler organizes his general arguments regarding the relationship between JRC and the *Daily Times* along four lines: functional integration of operations, centralized control of labor relations, common management, and common ownership.[20] These categories correspond largely to the "single entity" veil piercing theory.

Ziegler first argues that there is a functional integration of operations between JRC and the *Daily Times.* In support of this contention, Ziegler points to deposition testimony showing that JRC centralizes aspects of certain functions, such as information systems and printing, of the papers it owns, Pl.'s Mem. of Law at 46. Ziegler also notes evidence showing that when a JRC paper in Coatesville, Pennsyl-

---

**18.** We note that the *Miners, Inc.* panel immediately noted that the "single entity" theory "has yet to be adopted in Pennsylvania", *Miners, Inc.,* 722 A.2d at 695. However, in light of the *Marzano* holding, which appeared to focus on this type of veil piercing, we will nevertheless consider these factors.

**19.** That is, as defendants argue, it is undisputed that the *Daily Times* hired Ziegler, paid him, directed his execution of his job duties, and controlled his work schedule throughout his employment with that organization.

**20.** Ziegler also argues that it was JRC who actually decided to terminate him, and we will address this below.

vania was closed, its subscription list was forwarded to a JRC-owned paper in West Chester, Pennsylvania, and observes that JRC's website contains hyperlinks to the websites of its component papers, Pl.'s Mem. of Law at 46–47.[21]

With respect to centralized control of labor relations, Ziegler points out that the 1998 W-2 form for Michael Starn, Ziegler's replacement, lists JRC as Starn's employer and that both Starn and Frank Gothie, the *Daily Times*'s publisher, received JRC stock options as part of their compensation, Pl.'s Mem. of Law at 48. Ziegler also points out that in answers to interrogatories, Robert Jelenic, JRC's CEO, stated that he had to power to, *inter alia*, hire, transfer, and discharge the employees of JRC or of facilities JRC owned,

Pl.'s Mem. of Law at 48, Ex. U, Pl.'s Mem. of Law (Defendants' Responses to Interrogatories). Further, Ziegler cites Frank Gothie's testimony that after JRC's purchase of the Goodson Newspaper Group was announced, Gothie became aware that JRC had a model for the number of people that it expected to be on the staff of a newspaper the size of the *Daily Times*, and that under this model, the *Daily Times* would have to reduce the number of people on its staff in certain ways after JRC's takeover, Pl.'s Mem. of Law at 48–49.[22] Finally, Ziegler observes that new hires at any JRC facility must be approved by JRC corporate headquarters, and that such hires are documented through the use of a standardized form, Pl.'s Mem. of Law at 50.[23]

---

**21.** In connection with his argument regarding the functional integration of operations, Ziegler also cites to evidence relating to JRC's relationship with some of its other corporate subsidiaries. The primary source of this evidence is depositions and other discovery taken in a different case from the District of New Jersey, *Leslie v. Journal Register Company,* No. 97–5178(AET). In *Leslie,* the plaintiff, who over sixteen years of employment had worked in many positions for JRC, its corporate predecessor, and its newspapers, sued JRC for age discrimination based upon his January 1997 discharge, Ex. O, Pl.'s Mem. of Law (Chief Judge Thompson's memorandum denying the defendant's motion for summary judgment in *Leslie*) at 1–2. Ziegler attached extensive excerpts of five depositions taken in *Leslie* as exhibits to his opposition to the defendant's motion for summary judgment, in addition to Chief Judge Thompson's opinion, and he cites to this evidence frequently in his memorandum of law.

However, we cannot see how this evidence is relevant to our case. The question we face here is the nature of the relationship between the *Daily Times* and JRC at the time of Ziegler's termination. We cannot see how it matters, for example, that "Leslie testified in his deposition ... that after Mr. Jelenic discharged Larry Singer, Phoenixville publisher, Mr. Leslie was assigned to serve as the publisher of Phoenixville while continuing to do JRC corporate work." Pl.'s Mem. of Law at 46. While such anecdotal evidence might be relevant in the aggregate to JRC's relationship to the newspapers specifically discussed in the testimony, it cannot be material to JRC's

relationship with a different paper at a different time.

Beyond the question of its application to the interpretation of the relationship between JRC and the *Daily Times*, we also cannot accept the application of this evidence to this action in general. Ziegler makes frequent use of the *Leslie* evidence in his memorandum, citing it interchangeably with evidence from discovery taken in this case. We find, with little exception, that the other uses of this evidence suffer from the same absence of materiality or relevance as that we have discussed here, and we will not, for the most part, discuss this irrelevant evidence further as we assess Ziegler's arguments.

**22.** "For example, we were going to have two less people in the news room from the staff. That we were no longer going to have a production director. That we were going to have three executives in the circulation department, not four." Ex. B, Pl.'s Mem. of Law (Dep. of Frank Gothie) at 80.

**23.** Before we move on, it makes sense here to discuss an alleged admission by Robert Jelenic that Ziegler cites connection with this question, as well as in connection with several other issues in his memorandum. Ziegler argues that Jelenic admitted in his deposition that it was he (Jelenic) who terminated Ziegler. The exchange at the deposition upon which this is based, as recorded in the typed transcript, follows:

Q: But you are essentially preventing these people from possibly getting future

Moving to the question of common management, Ziegler notes that in its Answer to the Complaint, JRC stated that the two individual defendants, Jelenic and Higginson, were officers both of JRC and of "The Goodson Holding Company d/b/a the Daily Times", Pl.'s Mem. of Law at 52. Ziegler also points to testimony that Frank Gothie has phone contact with Jelenic and Jean Clifton, JRC's Chief Financial Officer, several times weekly, that JRC conducts consolidated meetings for the publishers of its papers and that individual paper's budget meetings are sometimes held at JRC's corporate headquarters, and that various staff members of JRC's newspapers, including the Daily Times[24], periodically travel to JRC's headquarters in Trenton, New Jersey, Pl.'s Mem. of Law at 51–52. As to common ownership, the last category of contacts that Ziegler documents, there appears no question but that the Daily Times and JRC have common ownership, since JRC itself owns the Daily Times.

As we have just rehearsed at length, Ziegler directs our attention to many contacts between JRC and the Daily Times. After careful examination, however, we conclude that these do not raise a question of material fact as to whether JRC was Ziegler's employer. Recall, first, that there is a strong presumption against piercing the veil so as to hold a parent liable for the actions of a corporate subsidiary. Equally important, recall the fundamental point that we mentioned at the outset: to the extent that JRC was Ziegler's employer, it could only have been so through the Daily Times and therefore only for those few hours between the sale closing and Ziegler's termination.

Therefore, in looking for connections between the two entities that would justify taking the substantial step of piercing the

---

employment in other areas and at other facilities?

A: They could have had the job working for us.

Q: On your terms.

A: Our terms were—our terms were the Goodson terms.

Q: So you took over the Goodson terms with regard to management personnel?

A: Pretty well. I can't—publishers, pretty well with the publishers.

Q: Okay. So you discharged Mr. Ziegler.

A: I discharged Mr. Ziegler.

Q: Or your—you were running the company that discharged Mr. Ziegler?

A: I didn't—

Q: The Journal Register Company?

A: Journal Register Company. Mr. Ziegler was discharged by the Delaware County Times, not by Journal Register Company.

Q: Was Mr. Ziegler discharged by the Delaware County Daily Times under the ownership of the Journal Register Company?

A: That's a true statement.

Ex. C, Pl.'s Mem. of Law (Dep. of Robert Jelenic) at 65–66.

We find that this cannot be reasonably interpreted, by either this Court or any jury, as an admission. We first observe that in his verification of the deposition transcript, Jelenic noted as a correction that his statement, "I discharged Mr. Ziegler", should have been followed by a question mark, Ex. G, Defs.' Mem. of Law (Dep. of Robert Jelenic).

Much more than this, however, the context of the question and answer conclusively confirms that his statement, which was a repetition of the question, was not an admission. Most significantly, Ziegler's counsel's contemporaneous reaction to his statement ("Or your—you were running the company that discharged Mr. Ziegler") is a clearly not a reasonable reaction to Jelenic's positive statement that he discharged Ziegler. The subsequent question and answer, in which Ziegler's counsel attempted to ascertain exactly who or what terminated Ziegler, would be silly and pointless if Jelenic's statement "I discharged Mr. Ziegler" had not clearly been a questioning response to counsel's query.

We further note that, as can be seen from the quoted portion above, the question about Ziegler's termination did not arise naturally from the previous line of questions, and therefore we would expect that Jelenic would react with surprise to counsel's statement, "So you discharged Mr. Ziegler." For all these reasons, no reasonable person could view this deposition statement as an admission, and we cannot permit its use as such here.

**24.** In particular, Ziegler points to the fact that Mike Murray, who succeeded Michael Starn as the Daily Times's Circulation Director, traveled to Trenton eight times between August 15, 1999 and September 2, 1999, as reflected in his travel vouchers, Pl.'s Mem. of Law at 52.

corporate veil and finding that JRC was Ziegler's employer, we must look not to the relationship that has come to exist between the *Daily Times* and JRC between July 1998 and now, but rather the relationship as it existed in the moments immediately after the sale closed. For this reason, the evidence the plaintiff puts forward—regarding such things as the current frequency of contact between Frank Gothie and JRC executives, or the fact that *Daily Times* employees now may frequently travel to JRC's headquarters, or that *Daily Times* budget meetings are sometimes conducted at JRC headquarters—are all irrelevant and inapposite to the question before us. Similarly, the fact that Jelenic claims to have the power to hire and fire employees of the papers that JRC owns, or that JRC must approve its paper's hiring decisions, are not by themselves helpful to us. The question is the extent to which there was in fact interrelation between the *Daily Times* and the JRC in the hours immediately following the sale closing on July 15, 1998, not whether there was a potential for it to happen in the future.[25]

It is, to be sure, true that there were contacts between JRC and the *Daily Times* before the time of the sale closing, and that these contacts may illuminate the relationship that existed immediately following closing, the time of Ziegler's termination. Some of these contacts are also associated with the chain of events leading to Ziegler's termination, and we will therefore discuss those at length before addressing whether they would allow a reasonable jury to conclude that JRC was Ziegler's employer.

In April 1998, David Carr of the Goodson Newspaper Group informed Frank Go-

thie, the *Daily Times*'s publisher, that a sale agreement was imminent with JRC, Ex. B, Pl.'s Mem. of Law (Dep. of Frank Gothie) at 69. Later that month, Frank Gothie met for the first time with Robert Jelenic, JRC's CEO, and Jean Clifton, JRC's CFO, *id.* at 77. In this meeting, which took place at the *Daily Times*'s offices, Jelenic spoke with Gothie about Gothie's future with the paper—Jelenic asked if Gothie would be willing to stay on as publisher—and stated that it was his (Jelenic's) hope that the ultimate settlement would happen quickly, *id.* at 77 & 78. Jelenic gave Gothie an overview of JRC's history and its concept of operations, and sounded Gothie out on the *Daily Times*'s market, as well as the paper's sports coverage, *id.*

In either May or early June, 1998, Gothie went to JRC headquarters in Trenton, New Jersey and met with several JRC executives, including Jelenic and Clifton, *id.* at 81. At this meeting, which lasted several hours, the participants discussed the *Daily Times*'s operations as well as JRC procedures and JRC's expectations of Gothie as a publisher, *id.* at 82. They discussed a host of specific topics, including *Daily Times*'s advertising (*e.g.*, average rates and biggest advertisers), whether the *Daily Times* expected to make budget, whether the *Daily Times* should consider launching new products, the retail atmosphere in Delaware County, the quality of the sales staff, financial reporting procedures that the *Daily Times* would have to follow after the purchase, the type of reporting to JRC that would be required, the *Daily Times*'s labor union environment, the strength of the *Daily Times*'s competition, and the condition of

---

**25.** To the extent that Ziegler has, in his arguments set forth above, identified some connections between JRC and the *Daily Times* existing on July 15, 1998, these do not amount to enough evidence to permit a jury reasonably to find that JRC was Ziegler's employer. For example, the fact that Gothie's terminations on July 15, 1998 may have been

in response to JRC's staffing model does not go to show that these specific decisions were not still Gothie's to make. Also, the fact that JRC had to approve new hires isn't related to the question here, since the employment actions in the first few hours of the parent/subsidiary relationship on July 15, 1998 were terminations.

the printing press and press crew, *id.* at 84–87, 91–92.

Later, a group of about five JRC executives went to the *Daily Times*'s offices to introduce themselves to *Daily Times* staff in a brief meeting, which most (if not all) of the *Daily Times* management employees, including Ziegler, attended. *Id.* at 95–96. Jelenic spoke briefly at the meeting, stating that JRC was happy to be acquiring the *Daily Times,* and introducing the other JRC executives who were present, *id.* at 96–100. After these remarks, and after *Daily Times*'s staffers asked one or two questions, the meeting adjourned, with the JRC executives greeting and shaking hands with some of the *Daily Times*'s staff, in a "receiving line" fashion, Ex. B, Pl.'s Mem. of Law (Dep. of Frank Gothie) at 100–01, Ex. E, Pl.'s Mem. of Law (Dep. of Thomas Abbott) at 20–24.

In addition to these face-to-face meetings between JRC and *Daily Times* staff, Frank Gothie had a number of phone conversations with JRC executives, Ex. B, Pl.'s Mem. of Law (Dep. of Frank Gothie) at 102. One such call, which Gothie believes occurred after the group meeting at the *Daily Times*'s offices, was a five or six minute conversation with Jelenic regarding the *Daily Times*'s circulation, and in this call Jelenic reflected his concern about the decline in the *Daily Times*'s circulation that he had seen from the Audit Bureau of Circulation reports for the *Daily Times, id.* at 102–04. Jelenic told Gothie that something would have to be done to stop the decline, and Jelenic told Gothie that he should talk to one Mike Starn, who was then the circulation director at the *West Chester Daily Local News* and who had done a good job there and at other JRC newspapers at which he had worked, *id.* at 103.

Shortly after this conversation, Gothie telephoned Starn and arranged to have lunch with him, *id.* at 105–06. Over a two-hour lunch, Gothie talked to Starn about the *Daily Times,* and asked Starn to talk about his background and the papers at which he had worked, *id.* at 106. After the meeting at the restaurant, Gothie called Jelenic and told him that Starn had been very impressive and articulate at the meeting and that they had discussed some of the ideas that Starn had found successful, *id.* at 114. Jelenic then asked Gothie if held like to have Starn as his circulation director, and Gothie said that he would, *id.* Jelenic told Gothie that if he wanted Starn, he should call Starn's publisher. Gothie did so and that publisher reluctantly gave Gothie permission to talk to Starn about the job, *id.* at 114–15. Gothie then called Starn and offered him the job of circulation director at the *Daily Times, id.* at 115.

These various contacts do not raise an issue of material fact such that a jury could reasonably find that JRC was Ziegler's employer. While Ziegler points to the meetings that took place between JRC and *Daily Times* staff (particularly Frank Gothie), there is no evidence that these meetings, which were informational in nature, led to any interrelation of JRC and the *Daily Times* at any point prior to the actual closing. To the extent that these meetings outline procedures that would begin after the closing, Ziegler points to no evidence to show that these procedures led, in the few hours immediately after the closing, to an integration of operations sufficient to hold JRC liable as Ziegler's employer.

Again, although Ziegler points to many contacts and interrelations that have come to exist between JRC and the *Daily Times* at some point *after* the closing, there is simply not enough evidence in the record to permit a reasonable jury to pierce the veil and find the JRC was Ziegler's employer at the time of his termination. *Marzano* and the cases it cites, particularly *Johnson v. Flowers Indus., Inc.,* demonstrate that there must be a close, ongoing relationship between two corporations in order to justify piercing the veil to hold a parent corporation liable under employment discrimination law. The evidence

that Ziegler cites does not establish that this relationship existed on the afternoon of July 15, 1998 when Ziegler was terminated. There is no evidence, for example, that JRC then controlled the *Daily Times*'s day-to-day operations, or that JRC, at that time, was making a routine practice of shifting employees between the *Daily Times* and JRC, or that JRC, at that time, was commingling assets of the corporations.[26]

Moreover, we note that the question here, under *Marzano*, is not whether a JRC employee may have played *some* role in Ziegler's termination. The question is whether the operations of JRC and the *Daily Times* were so integrated as to make them a single entity. Therefore, the fact that it was Jelenic who first suggested that Gothie contact Starn cannot be enough to permit the conclusion that JRC was, in some legal fiction sense, Ziegler's

employer.[27] Furthermore, although Jelenic suggested Starn's name to Gothie, Gothie's undisputed deposition testimony shows that it was he who decided that he wanted Starn on board[28]. Similarly, with respect to the other three people terminated from the *Daily Times* on July 15, 1998, Ziegler makes no argument that it was anyone other than Gothie's decision to do so.[29]

We have discussed this issue at such length because Ziegler sets such store on it as shown in the volume of evidence that he proffers in his effort to show that JRC was indeed his employer. Ultimately, however, our resolution of this question is simple. As *Marzano* and state corporate veil piercing law show, there is a presumption that a corporate parent is not the ADEA "employer" of its subsidiaries' employees. In order to pierce such a veil, a

26. It is an open question whether it would be possible, under the analysis discussed in *Marzano*, for any corporate parent to be considered to be the employer of its subsidiary's employees on the very day that the purchase of that subsidiary was finalized, since absent much more drastic actions than those here, it is difficult to see how the requisite interrelations could be so instantly established.

27. As noted in the margin above, there may be other liability theories that might be employed in an effort to hold JRC liable on a basis other than that JRC was Ziegler's employer. However, such liability is neither alleged specifically in Ziegler's Complaint nor argued in his papers. The point here is that the question of whether JRC had any involvement at all in Ziegler's termination is conceptually distinct from the question of whether JRC, as a corporate parent, can be held liable as Ziegler's employer. Only the latter question is before us; the former is not.

28. Rather than, for example, using Starn as a consultant or merely adopting his ideas while retaining Ziegler as circulation director.

29. As mentioned in the margin above, Ziegler makes much of the fact that Gothie had been presented with a "pro forma" which described the standard organization, including the number of employees, that each JRC paper was expected to have. However, there is no evidence that even to the extent he was actually required immediately to meet this

model, Gothie did not have full discretion to decide whom to terminate. Similarly, Ziegler points to deposition testimony from Gothie to the effect that if any of the head executives from JRC, to include, *inter alia*, Jelenic, Higginson, and Clifton, called him and told him to do something, he would do it, Pl.'s Mem. of Law at 26. This statement, however, fails to go to the question of what, exactly, these executives in fact told Gothie to do, and what effect such hypothetical orders might have on the relationship between JRC and the *Daily Times* as it existed immediately after the sale closing.

Likewise, Ziegler argues that Gothie's and Jelenic's use of certain pronouns in their deposition testimony shows that it was JRC who controlled Ziegler's termination. Gothie at one point testified that *"They* offered Mike Starn the job, he accepted the job before the actual transaction completed," (Ex. B, Pl.'s Mem. of Law (Dep. of Frank Gothie) at 146) (emphasis added). However, given Gothie's detailed testimony regarding the exact process by which Starn was offered the job, we cannot reasonably rely on such a statement to create a question of fact about whether JRC was Ziegler's employer. For similar reasons, Jelenic's statements to the effect that "we" decide whether or not to retain employees when a newspaper is acquired cannot, as a general statement, reasonably go to show a corporate interrelation that could satisfy the *Marzano* standard.

plaintiff must show a very close relationship between the parent and subsidiary. Ziegler here faces an additional hurdle in that the parent and subsidiary relationship had only existed for at most a few hours before the employment decision at issue in this case. As we have discussed in detail, such connections as later came to exist between JRC and the *Daily Times* are not relevant to the question of whether JRC was Ziegler's employer, and such connections as did exist in the moments after the sale closing are not sufficient to permit a reasonable jury to conclude that JRC was Ziegler's employer.

We therefore will enter judgment for defendant JRC as to Count 2.

### C. Evaluation of Plaintiff's Claims of Employment Discrimination Against the Daily Times and JRC

◼ We next consider the merits of Ziegler's discrimination claims. The defendants seek summary judgment on Counts 1 and 2 on the basis that Ziegler has not shown that the *Daily Times* or JRC violated the ADEA or the PHRA. As discussed in the previous section, JRC was not Ziegler's employer, and therefore Ziegler cannot maintain his claims in Count 2 that JRC terminated his employment in violation of these two statutes.[30] We now examine the claims of discriminatory discharge leveled against the *Daily Times* in Count 1.

#### 1. Direct or "Mixed Motives" Analysis

Although defendants do not discuss *Price Waterhouse* or "mixed motives" analysis in their motion for summary judgment, in his response Ziegler asserts that the allegations in Count 1 must survive summary judgment because the record contains direct evidence of age-based discrimination.

**30.** In fact, as the discussion of the *Price Waterhouse* and *McDonnell Douglas* analyses below will show, even if JRC were considered

◼ As discussed above, under *Price Waterhouse* the existence of "direct evidence" of the use of an illegitimate criterion would shift the burden of persuasion to the defendants to show that their decision would have been the same without discrimination. In order to shift the burden, it must be that "the evidence the plaintiff produces is *so revealing of discriminatory animus that it is not necessary to rely upon any presumption from the prima facie case* [as is necessary in a pretext action]," *Starceski v. Westinghouse Elec. Corp.*, 54 F.3d 1089, 1096 (3d Cir.1995) (quoting *Armbruster v. Unisys Corp.*, 32 F.3d 768, 778 (3d Cir.1994)). Our Court of Appeals has looked to Justice O'Connor's concurrence in *Price Waterhouse* for guidance on what would constitute such direct evidence:

> [S]tray remarks in the workplace, while perhaps probative of [a discriminatory animus], cannot justify requiring the employer to prove that its [employment] decisions were based on legitimate criteria. Nor can statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself, suffice to satisfy the plaintiff's burden in this regard; .... What is required is ... *direct evidence that decisionmakers placed substantial negative reliance on an illegitimate criterion in reaching their decision.*

*Starceski*, 54 F.3d at 1096 (quoting *Price Waterhouse*, 490 U.S. at 277, 109 S.Ct. at 1805 (O'Connor, J., concurring)) (emphasis in *Starceski*).

Still, "[i]n point of fact, the term 'direct evidence' is somewhat of a misnomer, for we have held that certain *circumstantial* evidence is sufficient for a mixed motives [jury] instruction, if that evidence can 'fairly be said to directly reflect the alleged unlawful basis' for the adverse employment decision," *Walden v. Georgia–Pacific Corp.*, 126 F.3d 506, 513 (3d Cir.1997)

Ziegler's employer, there is still no basis for a finding of liability under the ADEA against it.

(quoting *Hook v. Ernst & Young*, 28 F.3d 366, 374 (3d Cir.1994)) (some internal quotation marks omitted). On the other hand, our Court of Appeals "ha[s] also repeatedly made clear that a plaintiff must clear a high hurdle to qualify for a mixed-motives instruction: 'The burden of persuasion shifts to the employer only after the plaintiff ha[s] proven that [his] employer acted unlawfully, and not merely on the basis of a prima facie showing,'" *Walden*, 126 F.3d at 513 (quoting *Hook*, 28 F.3d at 374) (some internal quotation marks omitted).

Ziegler points to a number of items of evidence in the record to support his contention that the burden should shift here to the defendants. None of the proffered evidence, however, constitutes direct evidence of a discriminatory basis for Ziegler's termination.

The first set of "direct" evidence that Ziegler cites is taken from five depositions from the *Leslie v. Journal Register Company* case in the District of New Jersey [31]. The testimony purports to document, *inter alia:* age discrimination carried out by JRC generally, JRC's corporate culture of age discrimination, Robert Jelenic's reference to older employees as "gray haireds", JRC's direction that young women should be hired to staff the advertising department of a Pawtucket, Rhode Island paper, the fact that the entire Italian over-forty workforce in the circulation department of the *New Haven Register* was terminated after JRC bought that paper, Pl.'s Mem. of Law at 60. However, none of this evidence in any way constitutes direct evidence, for, among other things, the simple reason that none of it is connected in any way to the decision to terminate Ziegler, or even to JRC's management of the *Daily Times* in general.

The next purportedly "direct" evidence Ziegler offers is a statement Jelenic made in his deposition:

Q: Okay. So the decision to discharge Wayne [Ziegler] was because the circulation was declining; is that correct?

A: No. I told you before. You're not listening to my answers. We thought that the circulation department could be run better, more aggressively, and one of the factors was that circulation was down for a lot of years. But I think it was more from the point of view of Tony Simmons and people like that thought we could be more aggressive in the circulation area.

Q: Did you ever refer to the appointment of Mike Starn as providing new energy?

A: That would make sense, from what I just said. More aggressive, new energy, I think the two go together.

Ex. C, Pl.'s Mem. of Law (Dep. of Robert Jelenic) at 85–86. Ziegler then refers to a deposition in the *Leslie* case in which a former JRC Human Resources Director testified that Jelenic ordered her to hire "young employees, energetic" and that Jelenic remarked to her that older employees didn't like to work. Pl.'s Mem. of Law at 61. Consequently, Ziegler contends that this demonstrates that Jelenic equates energy with youth, and thus his deposition statements show that he wanted a younger person in circulation at the *Daily Times*.

Again, this is not direct evidence that Ziegler's termination was age-based. Even to the extent that it was in fact Jelenic who terminated Ziegler [32], his alleged remarks to the human resources director were completely divorced from the *Daily Times* acquisition or the termination of Ziegler. We cannot take Jelenic's use of the term "energy" in a deposition—particularly in response to a question that introduced that term—legally to constitute direct evidence of discrimination where the plaintiff can point to no "age-ist" remarks made specifically in connection with his

---

**31.** We have discussed Ziegler's use of evidence from this case in note 21 above.

**32.** As discussed above, the record contains no evidence to contradict Gothie's assertion that he came to this determination independently.

own termination or even in connection with the *Daily Times* in general.

Ziegler also argues that the timing of Jelenic's conversation with Gothie about circulation issues at the *Daily Times* is direct evidence of discrimination. Ziegler points out, as discussed above, that Gothie testified that the phone call in which he and Jelenic first discussed the *Daily Times*'s declining circulation, and the need to change that trend, occurred after Jelenic and other JRC executives had been to the *Daily Times*'s office and had met the staff, including Ziegler. Ziegler apparently seeks to draw the inferences that (1) Jelenic saw Ziegler, (2) concluded that he was old, and then (3) decided to make circulation an issue with Gothie because of Ziegler's age. To describe this reasoning is to demonstrate that this sequence of actions cannot constitute direct evidence of discrimination within the *Price Waterhouse* scheme.

Finally, Ziegler argues that JRC Vice-President William Higginson's reaction to Ziegler's statement at the time of the termination is direct evidence of age discrimination. Higginson was present at the *Daily Times* on July 15, 1998 as JRC's corporate representative to address any issues arising in the change of control as part of JRC's standard operating procedures, Ex. C, Pl.s Mem. of Law (Dep. of Robert Jelenic) at 70–72. Higginson testified that he went to the *Daily Times* in part because Gothie had eliminated the position of production director on Higginson's recommendation, and Higginson (who is JRC's Vice-President for Production) wanted to ensure a smooth transition, Ex. D, Pl.'s Mem. of Law (Dep. of William Higginson) at 60–62. Ziegler testified that Higginson was present in Gothie's office when Gothie called Ziegler in and told him he was terminated, Ex. A, Pl.'s Mem. of Law (Dep. of Wayne Ziegler) at 148. After Gothie told Ziegler this bad news, Ziegler informed the men that he had a statement to make, and stated to them that the only reason he was being terminated was his age, *id.* at 149. Ziegler testified that after this statement neither Gothie nor Higginson said anything for fifteen or twenty seconds, *id.* Ziegler, citing to *Black's Law Dictionary* and Fed.R.Evid. 801, argues that Higginson's silence following Ziegler's statement constitutes an admission because Higginson would be naturally be expected to deny such an allegation if it were untrue.

We first observe that Ziegler fails to elaborate this claim to any extent, setting it forth in a single sentence, Pl.'s Mem. of Law at 62. Moreover, Ziegler proffers no evidence that would go to show why Higginson would reasonably have been expected to respond to this statement. There is no evidence in the record that Higginson had any role in, or even knowledge of, Ziegler's termination prior to July 15, 1998, and therefore Ziegler has failed to demonstrate, nor could we or any reasonable factfinder ascribe, any legal significance to his failure to respond to Ziegler's statement. Indeed, far from demonstrating *qui tacet, consentire videtur,* Higginson's silence could just as well show his polite sensitivity at a difficult time in another man's life.

We conclude that no jury could reasonably take the evidence Ziegler has proffered as direct evidence sufficient to shift the burden to the defendants in the *Price Waterhouse* scheme.

### 2. Indirect or "Pretext" Discrimination.

#### a. The Prima Facie Case

The first step in the *McDonnell Douglas* analytic framework is the plaintiff's production of evidence sufficient to prove the elements of a prima facie case. In age discrimination cases, a prima facie case has four elements: "(i) the plaintiff was a member of the protected class, i.e., was 40 years of age or older (*see* 29 U.S.C. § 631(a)), (ii) that the plaintiff was discharged, (iii) that the plaintiff was qualified for the job, and (iv) that the plaintiff was replaced by a sufficiently younger per-

son to create an inference of age discrimination," *Keller*, 130 F.3d at 1108.

For the purposes of this motion, at least, the defendants do not dispute that the plaintiff can make such a showing on the evidence in the record.[33] We therefore move to the second *McDonnell Douglas* step.

### b. *The Legitimate Justification for Termination*

In this step of the *McDonnell Douglas* analysis, "[t]he burden of production (but not the burden of persuasion) shifts to the defendant, who must then offer evidence that is sufficient, if believed, to support a finding that it had a legitimate, nondiscriminatory reason for the discharge," *Keller*, 130 F.3d at 1108. Significantly, "[t]his burden is one of production, not persuasion; it can involve no credibility assessment," *Reeves*, 120 S.Ct. at 2106 (internal quotation marks omitted). We have little difficulty in finding that the defendants have carried their burden.

As the legitimate, nondiscriminatory explanation for Ziegler's termination, the defendants contend that the *Daily Times*'s circulation had been in decline for years. The primary evidence the defendants cite in support are the annual Audit Bureau of Circulation (A.B.C.) circulation reports. A.B.C. is an independent auditor that verifies newspapers' reports of their circulation, Ex. A, Pl.'s Mem. of Law (Dep. of Wayne Ziegler) at 56. The *Daily Times* A.B.C. reports for 1990 through 1998[34], show a significant decline in Monday through Friday circulation (61,160 in 1990 and 50,846 in 1998) as well as losses in Sunday circulation (50,837 in 1990 and 48,823 in 1998). The Monday through Friday

circulation showed a drop in each year of reporting. Sunday circulation showed a small increase between 1990 and 1991, and again between 1992 and 1995, but between 1995 and 1998 Sunday circulation dropped 5.5% Defs.' Mem. of Law at 6, Ex. 1, Pl.'s Mem. of Law (A.B.C.Reports).

As Circulation Director, Ziegler was "totally in charge of all phases of the circulation department," Ex. A, Pl.'s Mem. of Law (Dep. of Wayne Ziegler) at 23, and Ziegler understood that the decline in circulation was undesirable and that Gothie expected Ziegler to work to correct it, *e.g., id.* at 117–18, Ex. B, Defs.' Mem. of Law (Second Dep. of Wayne Ziegler) at 72–73, 82. Moreover, Gothie had communicated to Ziegler in writing many times regarding Gothie's belief that the declining circulation numbers were troublesome and that the trend needed to be changed; *see* Ex. C, Defs.' Mem. of Law (Exhibits from Ziegler's Deposition) at:

- DELCO90–91[35] (memo from Gothie to Ziegler dated July 5, 1989, stating in part, "Our goal is to return our daily circulation to a growth pattern");
- DELCO74–75 (letter from Gothie to Ziegler dated December 28, 1992, stating in part that "[w]e will need to find ways to build single copy sales as well as sustain the growth of home delivery. Returning to our daily ABC figure above the 60,000 threshold should not be unrealistic if the Inquirer boosts their price and we continue to skillfully promote ourselves effectively");
- DELCO72 (memo from Gothie to Ziegler dated September 13, 1993, stating in part, "[w]ith our circulation down

---

**33.** It is undisputed on the record that Ziegler was 60 years old on July 15, 1998, that he was indeed terminated, and that he was immediately replaced by Michael Starn, who was then 36 year old. Thus, the only issue that the defendants could even potentially dispute was whether Ziegler was "qualified" to perform the job of Circulation Director, a job he had held for approximately twenty years.

**34.** The *Daily Times* audit cycle ends on June 30 of each year. Therefore, the 1990 report covered the twelve month period ending June 30, 1990 and the 1998 report covered the twelve month period ending June 30, 1998.

**35.** These exhibits, and other portions of defendants' summary judgment exhibits, were Bates-numbered.

from a year ago and the fact that we're not recovering well, I think it's important for you, Richie, Bob, and I to determine what we can do this fall to grow the number");

- DELCO186 (memo from Gothie to Ziegler dated May 16, 1994, stating in part, "[u]nfortunately circulation figures were not where we wanted them to be in April and as a result the incentive pay plan you are on did not provide any additional earnings. However, I have authorized a $325.00 bonus payment ... because I believe your efforts deserve some recognition,");

- DELCO62 (memo from Gothie to Ziegler dated November 22, 1994, stating in part, "[t]his year one of our most important issues we will address is how we will re-build our daily circulation");

- DELCO66–67 (letter from Gothie to Ziegler dated December 27, 1994, stating in part, "Wayne, the circulation picture continued to be a mixed bag. Although Sunday's number is hanging on pretty much with year ago levels, the daily continued to decline. Perhaps with the extra help ... we can turn it around");

- DELCO36–37 (letter from Gothie to Ziegler dated December 26, 1995, stating in part, "Wayne, our aggressive efforts to build circulation will undoubtedly be needed to continue into the new year.... It seems the number has finally bottomed out, we'll need to look for new and creative methods to grow....");

- at DELCO34–35 (letter from Gothie to Ziegler dated December 13, 1996, to which Gothie appended a handwritten

note stating in part, "Wayne—The *most* important challenge this newspaper faces is the stabilization of our circulation.... I'm counting on you.").

The defendants have thus met their burden by demonstrating that circulation *was* declining, that *Daily Times* management since 1989 saw this decline as a problem, and that Ziegler was to a great part responsible for circulation. As the defendants have succeeded in proffering a legitimate, nondiscriminatory explanation for Ziegler's termination, we now move to examine Ziegler's claims of pretext.

### c. *The Claimed Justification as Pretext*

As the defendants have produced a legitimate, nondiscriminatory justification for Ziegler's termination—namely, that circulation of the *Daily Times* had been falling for the last nine years of Ziegler's tenure as Circulation Director—we now move to the third step of the *McDonnell Douglas* analysis, in which the plaintiff must produce evidence to show that the proffered justification was a pretext for discriminatory behavior.

Here, "the plaintiff may attempt to establish that he was the victim of intentional discrimination 'by showing that the employer's proffered explanation is unworthy of credence,'" *Reeves*, 120 S.Ct. at 2106 (quoting *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981)), or by submitting evidence "from which a factfinder could reasonably ... believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action," *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir.1994).[36] In this regard,

---

**36.** In *Reeves v. Sanderson Plumbing Products, Inc.,* the Supreme Court reversed a decision by the Fifth Circuit and held that to avoid summary judgment an ADEA plaintiff need not present sufficient evidence to show that age was a motivating factor in the challenged employment decision, but rather that a plaintiff's demonstration of sufficient evidence to

permit the factfinder to find that the employer's asserted justification is false may itself permit a trier of fact to conclude that the employer invidiously discriminated, *Reeves,* 120 S.Ct. at 2108–09. As can be seen from the discussion in the text, the *Fuentes* scheme permits a plaintiff to succeed if he makes either showing.

[t]o discredit the employer's proffered reason, however, the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent. Rather, the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them unworthy of credence.

*Fuentes*, 32 F.3d at 765 (internal quotation marks and citations omitted). On the other hand, a demonstration that discrimination was more likely than not the motivating cause of the employment decision must rely on "evidence that proves age discrimination in the same way that critical facts are generally proved—based solely on the natural probative force of the evidence." *Keller*, 130 F.3d at 1111. "While this standard places a difficult burden on the plaintiff, it arises from an inherent tension between the goal of all discrimination law and our society's commitment to free decisionmaking by the private sector in economic affairs," *Fuentes*, 32 F.3d at 765 (internal quotation marks omitted).

To the extent a plaintiff's job performance is something we must consider in evaluating the employer's proffered reason for termination, a plaintiff "cannot survive summary judgment . . . simply by pointing to evidence that could convince a reasonable factfinder that he did as well as he could under the circumstances. . . . [H]e must show, not merely that the employer's proffered reason was wrong, but that it was so plainly wrong that it cannot have been the employer's real reason," *Keller*, 130 F.3d at 1109.

Ziegler refers to at least seven different sets of evidence in arguing that the decline in *Daily Times* circulation was only a pretext for terminating him as Circulation Director and that age discrimination was the true reason. We now consider each set.

First, Ziegler argues that the circulation of the *Daily Times* was not in fact declining. In particular, he notes that with the addition of a Saturday paper in 1997 (the *Daily Times* had previously only been Monday through Friday and Sunday) the average weekly circulation, as documented in the A.B.C. reports, was in fact up, Pl.'s Mem. of Law at 64. This evidence could not serve to permit a jury to reject the defendants' nondiscriminatory justification. Ziegler's comparison of cumulative circulation figures that include a new Saturday edition with those that do not is a comparison of apples to oranges: these figures simply cannot be compared with any rational meaning. Moreover, Ziegler makes no argument to gainsay the fact that Monday through Friday and Sunday circulation *was* in fact dropping, as the defendants have documented. Ziegler's creative use of circulation statistics thus does not reasonably cast doubt on the nondiscriminatory reason for his discharge.

Next, Ziegler maintains that in fact the focus in JRC newspapers is on revenue, and not on circulation as such, and that therefore the justification for his discharge is pretext, Pl.'s Mem. of Law at 65. In support of this, Ziegler first notes that Jelenic testified that an increase in revenue, not an increase in circulation *per se*, was what he wanted, Ex. C, Pl.'s Mem. of Law (Dep. of Robert Jelenic) at 22 ("Circulation growth for the sake of circulation growth is not a major focus."). Ziegler then argues that he was in fact successful as circulation director with respect to revenue. He points out that his incentive pay was tied to revenue, not circulation, Ex. P, Pl.'s Mem. of Law (Ziegler's Incentive Pay Plans), and that he in fact received revenue-generated bonus pay almost every month between January 1996 and July 1998, Ex. Q, Pl.'s Mem. of Law (Ziegler's Bonus Pay Receipts).

This evident success in revenue, however, is not sufficient reasonably to cast

doubt on the proffered nondiscriminatory justification. First of all, it is not reasonable to interpret Jelenic's deposition testimony as meaning that circulation growth was unimportant or that the decline in circulation would not be troublesome. It is a common-sense proposition that, *ceteris paribus,* an increase in circulation will also increase revenue. In line with this economic reality, there is no dispute that Jelenic also testified that he was concerned about the *Daily Times*'s dropping circulation. Also, the mere fact that Ziegler received bonus payments based on revenue is not reliable information about the state of *Daily Times* revenue. An examination of the actual incentive plans, Ex. P, Pl.'s Mem. of Law, shows that under some plans Ziegler would receive some level of payment even if circulation revenue was below the budgeted amount, and in other plans he received a fixed percentage (generally in the neighborhood of one tenth of a percent) of circulation revenue. Under these plans, then, Ziegler's receipt of a revenue-based bonus provides no information whatever about whether the revenue results were good or bad.[37] Similarly, while Ziegler argues that revenues from January to June 1998 were up an average of over $23,000 per month from the same period in 1997, this bare fact cannot aid Ziegler's pretext theory, particularly as the Saturday edition of the *Daily Times* was launched in October 1997, thus destroying the comparative value of these figures.

Ziegler next presents evidence that he was receiving positive feedback for good performance, Pl.'s Mem. of Law at 65. He notes that in 1998 Gothie had given him tickets to a Phillies game as a performance reward and also that both Gothie and David Carr of Goodson Newspaper Group gave him letters of recommendation. Gothie testified that under the Goodson Newspaper Group, the paper had four tickets to each Phillies home game, and that Gothie gave tickets out to certain management employees, Ex. B, Pl.'s Mem. of Law (Dep. of Frank Gothie) at 169. Gothie stated that "one reason" such tickets are distributed was when he felt an employee was "doing a good job," *id.* However, there is no testimony here about why it was that Gothie gave these tickets to Ziegler. All we know from the evidence Ziegler proffers is that Gothie gave some tickets to some employees for their performance, not that Ziegler got his tickets for *good* performance. Moreover, even if the tickets were for "doing a good job", this minor reward for a "good job" cannot be enough reasonably to show that the nondiscriminatory justification is a lie.

As to the letters of recommendation, Ex. R, Pl.'s Mem. of Law (Recommendation Letters), neither Carr nor Gothie make any remarks at all about Ziegler's recent circulation numbers,[38] and so to the extent that they say positive things about Ziegler's abilities, they do not discount the justification for his dismissal. Instead, they at best support Ziegler's prima facie case in that they confirm that he was "qualified" for the job.

Ziegler next offers evidence that he says demonstrates that younger workers were in general treated more favorably than older ones, Pl.'s Mem. of Law at 65–67. He first argues that evidence regarding the *West Chester Daily Local News* shows that the circulation of that paper was in fact decreasing while Michael Starn[39] was circulation director, but he was hired at the *Daily News* while Ziegler was termi-

---

**37.** Or, more to the point, whether the results satisfied Ziegler's superiors' expectations.

**38.** Carr notes that Ziegler "lead [*sic*] the paper to its all-time high paid circulation of just over 60,000 daily," Ex. R Pl.'s Mem. of Law, but the A.B.C. reports show that daily Monday through Friday circulation fell from this

high consistently from 1990 until 1998. This remark from Carr is the only remark in any of the letters that applies to the quality or volume of *Daily Times* circulation after 1989.

**39.** Who was 36 years old at the time of Ziegler's termination.

nated. Ziegler also points out the case of Robert Jarjisian. Jarjisian, who is fourteen years younger than Ziegler, was the home delivery manager for the *Daily Times*, was retained after July 15, 1998, and subsequently became circulation director at the *West Chester Daily Local.* Ziegler argues that Jarjisian was responsible for the same circulation numbers as Ziegler was and that he was promoted instead of terminated.

Neither of these examples can go to show that there was discriminatory animus in Ziegler's termination. Ziegler has provided no evidence to show that Starn's circulation numbers or that his performance in general was not considered satisfactory by his supervisors at the *Daily Local News*.[40] Thus, the mere fact that both Starn's and Ziegler's circulation numbers—at different papers in different markets—were falling cannot be logically connected with the conclusion that both should have been treated the same by their employers. Ziegler is again attempting to compare apples and oranges in his effort to overcome the legitimate nondiscriminatory justification for his termination. The same reasoning applies to Jarjisian. While Ziegler claims that Jarjisian was equally responsible for the circulation numbers, and that therefore their differential treatment goes to show age discrimination, Jarjisian and Ziegler were in no way equally placed. Jarjisian was Ziegler's subordinate, and Ziegler's implicit claim that his own subordinate should have been held equally responsible for the falling circulation again makes no logical sense.

Ziegler next maintains that when JRC took over the *Daily Times*, older department heads were terminated and younger ones were kept. In addition to Ziegler, the other department head terminated on July 15, 1998 was Michael D'Arienzo, the Production Director, then 47 years old. Four department heads were retained: Steve Lambert, editor, then 41 years old, Thomas Abbott, Classified Advertising Director, then 37 years old, Elaine D'Arienzo, Display Advertising Director, then 43 years old, and John Tashjian, Business Office Director, then 41 years old.[41] Also terminated on July 15, 1998 were Bonnie Healy, City Editor, then 47 years old, and Steve Cantor, Promotions Manager, then 29 years old.

We cannot accept Ziegler's attempt to characterize these facts as evidence of age discrimination. While Ziegler is technically correct that the oldest two department heads were terminated on July 15, 1998, focusing on this obscures the fact that the majority of the department heads retained were over 40 years of age and therefore members of the same protected class as Ziegler. Moreover, the other "oldest" department head terminated with Ziegler, Michael D'Arienzo, was only 47 years old, still much younger than Ziegler. In that sense, it is hard to see how, relative to Ziegler, Michael D'Arienzo is terribly distinguishable from the retained department heads. Moreover, as noted above, the four *Daily Times* employees terminated on July 15, 1998 were diverse with respect to age, with one manager 29 years old. We therefore cannot accept that this "pattern"—if indeed it can be called that—of terminations could be seen by a reasonable jury in any way to show that Ziegler's termination was age-based.[42]

---

**40.** Conversely, the documentary record is replete with evidence that Ziegler's supervisor—Gothie—had long been dissatisfied with circulation performance.

**41.** We also note that publisher Gothie, who was of course retained, was then 53 years old.

**42.** Ziegler also appears to contend that two *Daily Times* union employees, a Mr. Caster-

line and a Ms. Oliver, who were 64 and 70 years of age respectively, were "forced from their employment" on July 15, 1998, and that this was evidence of the discriminatory pattern of behavior, Pl.'s Mem. of Law at 66. The only source cited in support of this contention are Frank Gothie's handwritten notes, and we cannot see how this meager evidence could support even the conclusion that these

Ziegler next argues that the defendants' proffered legitimate nondiscriminatory justification for his termination is too generalized, and that it is too easily used as a smokescreen since circulation is dropping at other JRC newspapers, Pl.'s Mem. of Law at 67. We do not find that such a claim reasonably could bring the defendants' explanation into doubt. While "declining circulation" might be in some sense a general justification, there is no dispute here that Ziegler was in charge of all circulation at the *Daily Times*. The various memoranda and letters from Gothie to Ziegler dating back over almost a decade prior to Ziegler's termination conclusively demonstrate that "declining circulation" in general was a matter of concern at the *Daily Times* and was something for which

people were terminated on July 15, 1998, much less that they were "forced" out.

Ziegler also argues that the intent to discriminate against him is demonstrated by the fact that since the JRC acquisition, "only young people have been hired to fill positions i.e. particularly young women in their 30's have been hired in advertising," Pl.'s Mem. of Law at 66. As evidence in support of this claim, Ziegler notes that the first two people hired to fill the newly-created position of Advertising Director were both women younger than the protected class, and that after the second of these left, the job was taken by a man who was then 39 years old, Pl.'s Mem. of Law at 37. He also argues that two recent *Daily Times* hires in advertising are women in their thirties, but notes that another recent hire was a woman in her early forties, *id.*

Again, this evidence does not logically serve to bring the proffered justification into question. First of all, although Ziegler maintains that the hires listed above represent the only hiring the *Daily Times* has done, the deposition testimony upon which his memorandum relies and cites does not make this clear. Moreover, this "pattern" of hires tells us little unless we know something of the applicant pool, of which we now know nothing. Moreover, to the extent that three of these hires were for the same position (advertising director), it could equally appear from the evidence that Ziegler provides that the *Daily Times* has a "pattern" of getting rid of thirty-something female advertising directors. This evidence, then, does not appear to be relevant or helpful in any meaningful way to the question at issue here.

Ziegler was held accountable. It is therefore beyond any reasonable question that the "declining circulation" complaint was not some hopelessly vague excuse that a discriminating employer pulled out of thin air in seeking to terminate Ziegler because of his age.

Similarly, the long history of Gothie's concern with declining circulation—concern that was documented for years before JRC's acquisition—forecloses Ziegler's claim that declining circulation made a convenient excuse for age discrimination simply because many of JRC's other newspapers have had declining circulation. What *is* relevant here are the conditions at the *Daily Times*, and the state of circulation at other JRC papers is simply beside the point of our discussion here.[43]

Lastly, with respect to hiring and firing patterns, Ziegler argues that Patrick Flanagan, a JRC employee now 59 years old, has three times applied for a jobs within the JRC company (one of which was the Circulation Director position at the Daily Times that opened after Michael Starn left) that have subsequently been given to younger men, that Raymond H. Lacaillade, now 56 years old, was discharged from JRC and replaced with a 27 year old woman, and that Alan Leslie, the plaintiff in the New Jersey *Leslie* case, now 55 years old, was discharged from JRC and his duties were taken by younger individuals. We cannot find that the experiences of these three people can have any significance to our case. The mere fact that other people have had experiences with JRC that might for them make out a prima facie case under the ADEA cannot be enough to overcome a proffered legitimate nondiscriminatory explanation in a case arising from a completely different setting in both place and time. No reasonable jury could take this evidence to bring into question the proffered legitimate explanation for Ziegler's termination.

**43.** This and other arguments that Ziegler makes with respect to JRC in general (including the alleged discrimination visited on Messrs. Flanagan, Lacaillade, and Leslie as detailed in the margin above) are associated with Ziegler's general position that it was JRC, and not the *Daily Times* or Frank Gothie, that terminated Ziegler. As we concluded above, to the extent there is any dispute of material fact on the subject, no jury could reasonably conclude that JRC was Ziegler's employer under the applicable legal tests.

Ziegler further contends that the defendants' legitimate nondiscriminatory explanation for his termination is pretextual because "a jury could reasonably find that circulation fluctuations were not caused solely by the plaintiff's performance but that other factors cause circulation fluctuations," Pl.'s Mem. of Law at 67. This argument, however, misses the point. As noted above, in seeking to demonstrate pretext, a plaintiff must do more than to show that the decisionmakers erred in discharging the plaintiff, or that the plaintiff did as well as he could have been expected to under the circumstances. Ziegler's theory here attempts to do both of these things in that he seeks to argue that the decline in circulation was not the result of his job performance or, alternately, that Gothie was mistaken in holding him responsible for the decline in circulation, which was in reality caused by other (exogenous) factors. Consequently, Ziegler's contention that the decline in circulation was caused by price increases, headlines, weather, population growth or decline, advertising sales, and competition is again simply misplaced in an effort to show that the defendants' claim that he was discharged because of the declining circulation was pretext.[44]

Ziegler also argues that he has demonstrated pretext because he had better qualification, years of experience, and levels of success that "far exceed[ed]" those of his replacement, Michael Starn, Pl.'s Mem. of Law at 68. Once again, we cannot see how this evidence could serve to discredit the defendants' justification for Ziegler's termination because it also seeks essentially to demonstrate that the decisionmakers were wrong, not that they unlawfully discriminated against him. Put another way, the question before us at this stage of the analysis cannot be whether in our or a jury's view Ziegler was or was not more qualified than Starn[45], but rather whether the defendants' proffered justification is false or, alternately, whether age discrimination was more likely than not a motivating factor for Ziegler's termination.

In sum, we find that none of the evidence[46] that Ziegler would deploy in an effort to demonstrate pretext could in fact reasonably allow a jury to conclude that the decline in the *Daily Times*'s circulation was in fact a pretext.[47] As we have

Moreover, we have detailed above the circumstances of Ziegler's dismissal, and in particular how it came to pass that Frank Gothie offered Ziegler's job to Michael Starn. As we noted there, it appears undisputed that Robert Jelenic was associated with this in that it was he who first gave Starn's name to Gothie. On the other hand, we cannot find that Ziegler has presented any evidence to establish that Gothie's testimony is not correct that it was he who decided to terminate Ziegler. In particular, there is no showing that JRC as such terminated Ziegler. Consequently, Ziegler's various arguments based on what JRC did or did not do in different times and places are inapposite to the analysis of Ziegler's own termination. Moreover, it is far from clear to us that any of these claims of discrimination in different times and places could be considered relevant to the instant dispute even if JRC had discharged Ziegler.

44. Here again, we find it most significant that the record going back over five years prior to Ziegler's termination documents the fact that Gothie, rightly or wrongly, was directing his concerns over declining circulation to Ziegler.

45. In relation to this, we note that according to Starn's undisputed deposition testimony, by the time he took the job at the *Daily Times* he had eighteen years of experience in the newspaper business, at least five of which were as circulation director at two different newspapers, Ex. I, Pl.'s Mem. of Law (Dep. of Michael Starn).

46. Ziegler also argues that the evidence he cited as constituting *Price Waterhouse*-type direct evidence would also go to show pretext. We have discussed that evidence at length above, and we conclude that just as it could not be seen to constitute direct evidence of discrimination, it cannot reasonably be construed to overcome the defendants' legitimate nondiscriminatory explanation for Ziegler's termination.

47. We also note that the decisionmaker in this case, Frank Gothie, was 53 years old when he terminated Ziegler's employment, and the inference of discrimination is therefore less since the decisionmaker was a member of the same protected class as the plaintiff, *e.g., Dungee v. Northeast Foods, Inc.,* 940 F.Supp. 682, 688 n. 3 (D.N.J.1996).

found that no jury could reasonably find that there was direct evidence of discrimination, judgment should be entered in favor of the *Daily Times* on Count 1.[48]

D. *Jelenic and Higginson's Aiding and Abetting of the Alleged Discrimination*

As we have just discussed, Ziegler's claims that he was discriminated against on the basis of his age must fail as a matter of law. Consequently, neither Jelenic nor Higginson can be held liable for aiding or abetting this legally non-existent discrimination. We will therefore enter judgment for these defendants as to Counts 3 and 4.

---

**48.** Above, we have found that JRC could not reasonably be found to be Ziegler's employer and we therefore entered judgment in favor of JRC as to Count 1. As we have noted in the margin above, even if JRC were considered to be Ziegler's employer for ADEA purposes, any claim against it for discrimination would fail under *Price Waterhouse* and *McDonnell Douglas* analysis for the same reasons as the claims in Count 1 against the *Daily Times* fail.